BIG RIVERS ELECTRIC CORPORA-
TION et al., Petitioners,

Commonwealth of Kentucky and Pea-
body Coal Company, Intervenors,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Russell E. Train,
Administrator, Respondent.

TENNESSEE VALLEY AUTHORITY,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, and Russell E. Train,
Administrator, Respondents,

Natural Resources Defense Counsel,
Inc., Intervenor,

Ed W. Hancock, Attorney General of
the Commonwealth of Kentucky,
Intervenor.

Nos. 74–2015, 74–2020.

United States Court of Appeals,
Sixth Circuit.

Sept. 4, 1975.

Leslie Henry, Wilson W. Snyder, Fuller, Henry, Hodge & Snyder, Toledo, Ohio, for petitioners in 74–2015.

Alan G. Kirk, II, Gen. Counsel, E. P. A., Thomas A. Pursley, III, Richard J. Denney, Jr., Charles W. Shipley, Pollution Control Section, U. S. Dept. of Justice, Washington, D. C., Ed W. Hancock, Atty. Gen., David D. Beals, Asst. Atty. Gen., Frankfort, Ky., Armistead W. Gilliam, Jr., Smith & Schnacke, Dayton, Ohio, Alfred V. J. Prather, J. William Doolittle, Prather, Levenberg, Seeger, Doolittle, Farmer & Ewing, Richard E. Ayres, Washington, D. C., for respondents and intervenors in both cases.

Thomas A. Pedersen, Robert H. Marquis, Gen. Counsel TVA, Beauchamp E. Brogan, Lynn G. Morehous, Knoxville, Tenn., for petitioner in 74–2020.

Before CELEBREZZE, MILLER and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

The underlying question in this case is whether the Administrator of the Environmental Protection Agency (EPA) properly disapproved a state regulation promulgated under the Clean Air Act Amendments of 1970, 42 U.S.C. §§ 1857a-j (Supp.1975), which would have authorized coal-burning plants ("sources" in the Act) to employ "alternate control strategies" for the control of air pollution by sulfur oxide gases without showing that constant emission controls of such pollutants are unavailable. Constant emission controls are achieved primarily by the installation of "scrubbers." The alternate control method employed by the petitioners consists principally of the use of intermittent emission limitations systems. The separate petitions for review filed by the Tennessee Valley Authority (TVA) and several electrical utilities companies operating in Kentucky (the Utilities) were

consolidated for hearing. At issue is the action of the Administrator in disapproving a portion of the Kentucky "Implementation Plan for the Attainment and Maintenance of the National and State Ambient Air Quality Standards" (Kentucky Plan). The portion which was disapproved provided as follows:

> Where it is demonstrated to the satisfaction of the [Kentucky Air Pollution Control] Commission that an air contaminant source can apply an alternate control strategy which will provide for achievement and maintenance of applicable ambient air quality standards, the Commission may, under such terms and conditions as it deems appropriate, authorize such a control strategy after a public hearing. Ky. Air Pollution Control Reg. No. AP-1, § 1(1)(b).

Original EPA approval of the entire Kentucky Plan was vacated by this court for failure to adhere to the requirements of the Administrative Procedure Act. *Buckeye Power, Inc. v. EPA,* 481 F.2d 162 (6th Cir. 1973). Subsequently the Kentucky Plan, with the exception of Section 1(1)(b), *supra,* was approved on August 9, 1974. The Acting Administrator of EPA stated with reference to Section 1(1)(b), his opinion "that this provision of the Kentucky plan—if not specifically disapproved—could be construed to permit intermittent control measures under circumstances where constant emission controls were available." To eliminate the possibility of such an interpretation the section was specifically disapproved for failure to meet the requirements of controlling federal regulations.

The Utilities and TVA maintain that EPA's disapproval of the quoted provision of the Kentucky Plan will prevent them from meeting the established air quality standards by use of "intermittent emission limitation" systems which are much less costly than scrubbers. The petitioners argue that the purpose of the Clean Air Act is to establish national standards of air quality within a scheme of dual responsibility which leaves to the States the task of formulating actual emission standards. They maintain that Congress has made air pollution control a partnership venture in which EPA sets standards and each State determines the methods best suited for reaching those standards within its geographical boundaries. Thus they argue that the Administrator has exceeded his statutory authority in disapproving a portion of the Kentucky Plan dealing only with a permissible method of controlling air quality while finding that the Plan otherwise met the national standards. In the alternative they contend that even if the Administrator possessed such power, his action in disapproving the Kentucky provision for an alternate strategy was arbitrary and constituted an abuse of discretion.

## Jurisdiction

Though the question has not been raised by any of the parties there is an issue with respect to the court's jurisdiction to consider these petitions. Judicial review of actions of the Administrator is provided for in Section 307 of the Act, 42 U.S.C. § 1857h–5(b)(1) as follows:

> . . . A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 1857c–5 of this title . . . may be filed only in the United States Court of Appeals for the appropriate circuit. . . .

There is no statutory provision for review of an action *disapproving* a plan or a portion thereof because disapproval is not a final administrative action. *Utah International, Inc. v. EPA,* 478 F.2d 126 (10th Cir. 1973). However, all parties including the Administrator have treated his action as a final approval of the Kentucky Plan with the disapproved portion eliminated, and we treat the proceedings as a petition for review of the approval of the Plan.

## The Mootness Issue

The Commonwealth of Kentucky, by its Attorney General, has been permitted to intervene in these proceedings, and has made a motion to dismiss them as

moot. EPA has also filed a motion to dismiss on the same ground. The Kentucky General Assembly in 1974 required administrative agencies of the Commonwealth, including the Department for Natural Resources and Environmental Protection (the Department), to file all their regulations by July 1, 1975. On March 1, 1975, the Department caused its proposed regulations to be printed in the *Administrative Register,* the official compilation of such regulations. On July 2, 1975, final review of the regulations took place and the new regulations became effective as of June 6, 1975. The current air pollution control regulations do not contain the language of Section 1(1)(b) of the former regulation or any equivalent provision which would permit approval by the Department of alternate control strategies. Thus it is argued that there is no case or controversy to be decided since the questioned regulation is no longer in force.

█ The jurisdiction of federal courts is limited by Article III of the Constitution to consideration of actual cases and controversies. Thus federal courts do not render advisory opinions or continue to consider an action if the controversy which underlies the action ceases to exist prior to its termination. *See United States v. Hamburg-American Co.,* 239 U.S. 466, 475–76, 36 S.Ct. 212, 60 L.Ed. 387 (1916); *California v. San Pablo & Tulare R.R.,* 149 U.S. 308, 314, 13 S.Ct. 876, 37 L.Ed. 747 (1893). For more recent Supreme Court pronouncements on the general doctrine of mootness, see *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971).

█ The mootness doctrine has limited application in at least two related types of cases. One type is specifically concerned with administrative orders. This limitation was first enunciated in *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), which involved preferential freight rates.

The terminal company instituted an action to challenge an order of the ICC which prohibited the granting of such preferences. The order expired before the case reached the Supreme Court, and the ICC argued that the case had become moot. The Court held otherwise, stating—"The question involved in the orders of the Interstate Commerce Commission are usually continuing (as are manifestly those in the case at bar), and their consideration ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review . . . . ." *Id.* at 515, 31 S.Ct. at 283. This is a proper case for application of the *Southern Pacific Terminal* doctrine since it concerns an order which is clearly capable of repetition, but which would evade review if the principle of mootness were strictly applied.

The other class of cases which requires relaxation of the mootness principle consists of those in which persons other than the parties to the action have a tangible interest or are likely to be directly affected by the outcome of the litigation. Cases which involve public interest, or rights of the public generally, are not necessarily rendered moot by an act which puts an end to the particular controversies which precipitated them. *United States v. W. T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). The fact that one party to whom an administrative order is directed elects to comply with it should not deprive others who claim to be adversely affected by the order from contesting it. *Cf. Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 122, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974). The public interest in determination of the question in this case is obvious. There is a subsisting controversy between the petitioners and EPA over the authority of the Administrator of that agency. The action of the Kentucky Department in no way answered the questions which this case raises concerning the Administrator's authority.

The motions to dismiss for mootness are denied.

## The Merits

The history of the Clean Air Act Amendments of 1970 (the Act) and its scheme for achieving and maintaining air quality through joint state-federal action are clearly described in *Buckeye Power, Inc. v. EPA, supra,* 481 F.2d at 165–66, and *Natural Resources Defense Council, Inc. v. EPA,* 489 F.2d 390, 394–96 (5th Cir. 1974), rev'd on other issues sub nom., *Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). The dual (state-federal) approach of the Act is basic to its structure, and this case requires a delineation of certain areas of authority reserved to each governmental partner. The contention of petitioners that the scheme of the Act limits the role of EPA to that of setting primary and secondary ambient air quality standards and leaves to the States the selection of the means of attaining and maintaining these standards is an oversimplification.

Involved in this case is Section 110(a)(2) of the Act, 42 U.S.C. § 1857c–5(a)(2), by which the Administrator is required to approve or disapprove each plan or portion thereof within four months after the date required for submission by the States, approving the plan "if he determines that it was adopted after reasonable notice and hearing" and that

(B) it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including, but not limited to, land-use and transportation controls; . . . .

The respondents and the intervenor, Natural Resources Defense Council, Inc. (NRDC), argue that the Administrator is not required to approve a plan which does not include emission limitations, and that an alternate control strategy which is based upon intermittent emission control measures does not meet this requirement. Such practices are said to merely disperse the pollutants emitted from sources without reducing the amounts. Thus, these parties construe the language of Section 110(a)(2)(B) to mean that a plan must require each source of pollution to apply continuous limitations to the amount of sulfur dioxide which it emits. (Though the limitations requirement applies to several contaminants, the present case is concerned with sulfur dioxide.) The alternate control strategy advocated by petitioners would permit a source to restrict its emissions by switching to low sulfur fuel or reducing operations at the source only during those periods when atmospheric conditions and existing pollution levels dictate a need for a specific source emission reduction. Implementation of the alternative strategy would depend on the aggregate of pollution in a given area rather than the emission from any particular source.

The Fifth Circuit dealt with the same basic issue in *NRDC v. EPA, supra,* which involved a provision of the Georgia Plan that permitted amounts of particulates and sulfur dioxide emissions to depend on the heights of smokestacks at the sources. The court held that this "tall stack" approach was in conflict with Section 110(a)(2)(B) of the Act since it resulted in the enhancement of dispersion of pollutants rather than limitation of their emission. Adopting the "broad approach" interpretation of Section 110(a)(2)(B), the court concluded that the Act established a policy of "nondegradation" of the atmosphere and that "[t]he only techniques fully capable of guaranteeing nondegradation are emission limitation techniques." 489 F.2d at 409.

The petitioners argue that the alternate control strategy which they would employ if the disapproved portion of the Kentucky Plan were reinstated would in fact be "emission limitations." It is their position that the intermittent control system provides a "flexible" emission limitation which restricts the amounts of pollutants emitted when atmospheric conditions require it. Thus, they contend that a system which *restricts* emissions of pollutants in any degree, if included in a plan, would qualify

that plan for approval if the other conditions of Section 110 were met. Furthermore, the petitioners point out that Section 110(a)(2)(B), in addition to requiring that a plan include emission limitations, also requires the inclusion of "such other measures as may be necessary to insure attainment and maintenance" of air quality standards. It is contended that "such other measures" refers to alternate control strategies.

The respondent and intervenor NRDC rely on the Fifth Circuit's answer to these arguments. That court held that the Act mandates the use of techniques for emission *reduction,* and that the use of other measures is permitted only when "necessary" in the sense that it is shown that emission reduction techniques are "unavailable or infeasible." 489 F.2d at 410. A plan which would permit unlimited emission of pollutants into existing clean air and require limitation only when emissions would cause air quality at the location of the particular polluting source to fall below prescribed standards would conflict with the congressional policy of nondegradation under the Fifth Circuit's interpretation of the Act.

On appeal to the Supreme Court, consideration of the Georgia Plan was limited to the question of whether variances were to be treated as "revisions" of the plan under Section 110(a)(3) or "postponements" under Section 110(f). *Train v. NRDC, supra,* 421 U.S. at 88–90, 95 S.Ct. 1470. The "tall stack" ruling was not appealed. Nevertheless, the Court traced the history of national clean air legislation and concluded that "the heart of the 1970 Amendments" is the requirement of Section 110(a)(2)(A) that each state plan provide for attainment, within three years of its approval, "of the national primary ambient air quality standards in the particular State." *Id.* at 66, 95 S.Ct. at 1476. After noting the requirement of Section 110(a)(2)(B) that a plan include "emission limitations, schedules, and timetables for compliance with such limitations," the opinion further noted that under the

statute "it [a State plan] must *also* contain such other measures as may be necessary to insure both timely attainment and subsequent maintenance of national ambient air standards." *Id.* at 67, 95 S.Ct. at 1476 (emphasis added). It is clear from this language that other measures may not be substituted for emission limitations, but may only be provided in addition thereto.

Thus the question in this case is whether the emission limitations requirement of Section 110(a)(2)(B) was satisfied by the Kentucky Plan in view of its provision permitting an air contaminant source to apply an alternate control strategy. If the requirement was satisfied, the Administrator was required to approve the Plan as submitted. In *Train v. NRDC,* the Supreme Court provided a definition of "emission limitations" as follows:

As we have already noted, primary ambient air standards deal with the quality of outdoor air, and are fixed on a nationwide basis at levels which the Agency determines will protect the public health. It is attainment and maintenance of these national standards which § 110(a)(2)(A) requires that state plans provide. In complying with this requirement a State's plan must include "emission limitations," which are regulations of the composition of substances emitted into the ambient air from such sources as power plants, service stations, and the like. They are the specific rules to which operators of pollution sources are subject, and which if enforced should result in ambient air which meets the national standards. *Id.* at 78, 95 S. Ct. at 1481.

The key word in this definition is "composition." The pertinent definition of "composition" in *Webster's Third New International Dictionary* appears to be "the nature of a chemical compound or mixture as regards the kind and amounts of its constituents . . . ." Under this definition a rule or regulation pertaining to sulfur dioxide or any other contaminant, would qualify as an emis-

sion limitation only if it regulates the *amount* of that kind of material which may be included in the emission from a given source.

The petitioners contend that the use of the word "composition" by the Supreme Court was unfortunate, but that the opinion in *Train v. NRDC* otherwise fully supports their position. They rely particularly on the following language:

> The Agency is plainly charged by the Act with the responsibility for setting the national ambient air standards. Just as plainly, however, it is relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met. Under § 110(a)(2), the Agency is *required* to approve a state plan which provides for the timely attainment and subsequent maintenance of ambient air standards, and which also satisfies that section's other general requirements. The Act gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of § 110(a)(2), and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards. § 110(c). Thus, so long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation. 421 U.S. at 79, 95 S.Ct. at 1481.

We cannot assume that the word "composition" was imprecisely used. The language quoted above follows the Court's definition of emission limitations and must be read in the light of it.

■■■■ No plan satisfies the requirement of Section 110(a)(2)(B) which might be construed to permit a source of pollu-

tant emissions to continue operating beyond the time limit established in Section 110(a)(2)(A) without the application of one or more systems which control the "kind and amounts" of its air contaminant emissions. The Administrator determined that the provision of the Kentucky Plan which he disapproved was susceptible of a construction which would permit state approval of measures not within the definition of "emission limitations" without a showing that measures which satisfy that definition were unavailable. We find that the Administrator acted within the scope of his authority, that his decision was not arbitrary and did not constitute an abuse of discretion.

The first purpose of the 1955 Clean Air Act was stated to be "to protect and enhance the quality of the Nation's air resources . . . ." 42 U.S.C. § 1857(b)(1). As the Supreme Court pointed out in *Train v. NRDC* the states responded slowly to expressions of congressional concern about air pollution between 1955 and 1970, and "Congress reacted by taking a stick to the States in the form of the Clean Air Amendments of 1970 . . . ." 421 U.S. at 64, 95 S.Ct. at 1474. The national policy is to reduce air pollution. Under the dual scheme, the freedom of the States to choose the manner of achieving this goal was made subject to the absolute requirement that every state plan include emission limitations as an ingredient. Nothing in the legislative history of the Act suggests that the Administrator has misinterpreted the congressional will in his construction of Section 110(a)(2)(B). As the Supreme Court noted in *Train v. NRDC,* interpretations of this complex statute by the agency charged with administering it are entitled to great deference. *Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *McLaren v. Fleischer,* 256 U.S. 477, 480–81, 41 S.Ct. 577, 65 L.Ed. 1052 (1921). This court finds no reason to substitute its judgment for that of EPA in construing the Act.

The petitions for review are denied.