**John R. HARRIS, Jr., Rudolph Johnson, Hugh S. Bryant, Jr., Plaintiffs-Appellees,**

v.

**PULLMAN STANDARD, INC., A Corporation, Defendant-Appellant.**

**No. 85–7792.**

United States Court of Appeals, Eleventh Circuit.

Feb. 13, 1987.

Edgar M. Elliott, III, Rives & Peterson, Birmingham, Ala., Charles Kelso, Fisher & Phillips, Don S. Lemmer, Atlanta, Ga., for defendant-appellant.

Arthur Green, Jr., Paden, Green, Paden & Bivona, Bessemer, Ala., for plaintiffs-appellees.

Before HILL and FAY, Circuit Judges, and MORGAN, Senior Circuit Judge.

MORGAN, Senior Circuit Judge:

Plaintiffs John R. Harris, Jr., William Rudolph Johnson, and Hugh S. Bryant, Jr. sued defendant Pullman Standard, Inc. (Pullman), seeking severance pay when Pullman terminated its employment benefits policy by selling its manufacturing plant to another corporation. Pullman alleged that plaintiffs were not entitled to severance pay because the plaintiffs were able to retain their same jobs under the purchasing corporation. After discovery in the case, both parties moved for summary judgment. The district court denied Pullman's motion and granted plaintiffs' motion, finding that Pullman's interpretation of its policy was arbitrary and capricious. We affirm.

Plaintiffs are former managerial employees at Pullman's rail car manufacturing plant in Bessemer, Alabama. On February 27, 1981, Pullman closed its Bessemer plant and put the property up for sale. Pullman terminated most of the plant's salaried employees as a result of the shutdown. Those employees received severance pay under Pullman's employment benefits policy, known as the Gen–20 policy. The plaintiffs, however, remained at the plant beyond the closing date because Pullman offered them an incentive bonus equal to 25 percent of their base salary if the three of them would continue to work at the plant

for a short period. In the letter making this offer, Pullman Vice-President T.R. Novack advised the plaintiffs that they would receive the special incentive bonus in addition to all other regular severance and benefit arrangements.

On Friday, February 24, 1984, Pullman sold all of its operations and assets to the Pullman Standard Division of Trinity Industries, Inc. (Trinity). Upon Pullman's suggestion, Trinity agreed to offer employment to a number of Pullman employees, including the plaintiffs. The plaintiffs accepted these offers and started working for Trinity on Monday, February 27, 1984, performing the same jobs that they had done for Pullman. Besides the change in corporate ownership, there were very few adjustments for the plaintiffs. Plaintiffs Harris and Johnson did have to accept a 12 percent wage cut in their new positions. Additionally, Trinity's benefit package was not as favorable as that of Pullman.

Prior to the plaintiffs commencing work for Trinity, plaintiff Bryant telephoned Rob Stanek, a Vice-President at Pullman, to inquire about severance pay from Pullman, accruing at the time of the sale of the manufacturing plant to Trinity. Stanek informed him that Pullman would not grant him severance pay because he had received a job offer from Trinity.

The plaintiffs then sued in state court seeking their severance pay under common law breach of contract claims. After the case was removed to the United States district court due to diversity of citizenship, the district court ruled that the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 (1982), applied to the case. After summary judgment motions by both parties, the district court ruled in favor of the plaintiffs, finding that Pullman's interpretation of the plan was arbitrary and capricious. Pullman then appealed.

The severance pay policy at issue provides the following:

PROCEDURE

I. Involuntary Termination:

\*    \*    \*    \*    \*    \*

For all involuntary terminations, other than "lay-off", a termination allowance will be granted in accordance with the following schedule in most instances:

(Schedule of Benefits Omitted)

Exceptions to these guidelines must be approved by the Vice-President, Administration.

C. Lay-Off—In many cases employees will be separated from the company with the intention that they will be recalled at a later date. Only those people who we intend to recall should be placed in a "lay-off" status.

Under this policy, an eligible exempt or non-exempt, non-bargaining employee is paid a portion of regular base salary during a lay-off. The schedule of unemployment benefits for salaried, non-bargaining employees is illustrated below.

(Schedule of Benefits Omitted)

An employee will not be eligible for both the above unemployment benefits and termination allowance.

The employee, to continue eligibility, must hold himself available for immediate return to work at all times during the period that unemployment benefits are paid. Also, the unemployment benefit paychecks must be personally picked up by the employee at the local personnel office. At that time, the employee must certify compliance with eligibility requirements for the entire period upon which payment is being made.

\*    \*    \*    \*    \*    \*

D. Job Elimination—Due to changing technology and job requirements, there will be occasions where positions are eliminated. Other opportunities within the company should be explored through coordination with the Division Manager, Staffing. In the event that a new assignment cannot be identified, the employee will be eligible for the termination allowance under involuntary termination.

The administrator of an employment benefits plan cannot deny benefits to employees in an arbitrary and capricious manner.

*Griffis v. Delta Family-Care Disability,* 723 F.2d 822, 825 (11th Cir.1984), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3514, 82 L.Ed.2d 823 (1984). The courts, in reviewing such decisions, must weigh the following factors to determine if the denial was arbitrary and capricious: (1) uniformity of construction, (2) "fair reading" and reasonableness of that reading; and (3) unanticipated costs. The following three additional factors are evidence of the plan administrator's good faith: (1) internal consistency of a plan under the interpretation given by the administrator or trustees; (2) any relevant regulations formulated by the appropriate administrative agencies; and (3) factual background of the determination by a plan and any inferences of lack of good faith. *Dennard v. Richards Group, Inc.,* 681 F.2d 306, 314 (5th Cir.1982). Using these guidelines, the district court found that Pullman's refusal to pay the severance benefits to the plaintiffs was arbitrary and capricious for four reasons.

■ First, the unambiguous language of the severance benefits policy at issue indicates that "for all involuntary terminations, other than lay-off, the termination allowance *will be granted."* (Emphasis added.) The district court held that plaintiffs were entitled to the termination allowance because they had been involuntarily terminated from their positions with Pullman. Although Pullman concedes that the plaintiffs' employment relationship with Pullman was terminated, Pullman contends that the jobs were not eliminated but continued under the control of a new company, Trinity. Pullman though fails to follow the policy's two part test for eligibility for severance pay. The policy terms indicate that an employee will be eligible for a termination allowance if the employee's job is eliminated, and a new assignment cannot be found for him within the company. In the context of the policy, the term "company" refers only to Pullman, not successive corporations. Pullman eliminated plaintiffs' jobs by the sale of the manufacturing plant to Trinity. Subsequently, Pullman failed to offer plaintiffs new opportunities within its company, so the plaintiffs became eligible for severance pay. The policy does not provide any exceptions to this eligibility if the corporate ownership changes and Pullman's employees obtain jobs with the new corporation. We are guided by the language of the policy, and any interpretation that contradicts the clear wording of the policy has to be arbitrary and capricious.

In *Anderson v. Ciba-Geigy Corp.,* 759 F.2d 1518, 1520 (11th Cir.1985), the employee benefit policy at issue defined severance pay as "payments made to an employee when the company terminates the employer-employee relationship...." We held that the sale of a division in the corporation terminated the employer-employee relationship, even though the employees retained their jobs under the new owner. "Termination [of the employer-employee relationship] may have been one of 'form not substance,' but it is clear that the 'form' of termination is the controlling factor under Ciba-Geigy's own definition of the word." *Id.* at 1521. Here, according to the terms of Pullman's policy, the sale of the corporation to Trinity involuntarily terminated the plaintiffs' jobs, thereby making them eligible for severance pay unless Pullman found the plaintiffs new jobs with the company.

A "special situation" provision in the Ciba-Geigy policy permitted Ciba-Geigy to deny severance payments to its employees without acting in an arbitrary and capricious manner. Such a discretionary provision is not present here. We must interpret this policy according to its terms and definitions.

■ Second, the district court found Pullman's interpretation of its plan arbitrary and capricious because Pullman required the plaintiffs to be unemployed in order to receive severance pay, even though the plan did not specify this as a condition precedent. The Seventh and Fourth Circuits in two unemployment compensation cases held that unemployment compensation was a purpose of their respective severance policies even though the

policies did not expressly say so. *Sly v. P.R. Mallory & Co., Inc.*, 712 F.2d 1209 (7th Cir.1983); *Holland v. Burlington Industries, Inc.*, 772 F.2d 1140 (4th Cir.1985). The policy at issue here, however, is distinguishable. This policy has a section on lay-offs which expressly conditions receipt of lay-off benefits upon unemployment. The policy indicates that an employee will not be eligible for both the unemployment benefits (lay-off benefits) and termination allowance. Such an election of benefits signifies that unemployment compensation is not one of the purposes of severance pay. After the fact, Pullman cannot add that requirement to prevent plaintiffs from receiving severance benefits.

Third, the district court determined that Pullman was inconsistent in interpreting its benefits plan. For instance, all employees whose jobs were terminated in 1981 and all employees who were not offered jobs by Trinity in 1984 received severance pay. All employees, however, who were offered jobs by Trinity did not receive severance pay. Only in the latter case did Pullman require unemployment as a condition to awarding severance pay for involuntary termination.

Fourth, the district court held that Pullman violated the procedural requirements of ERISA by failing to furnish copies of the benefits policy to *all* salaried employees, not just management such as the plaintiffs, and by failing to have any claims procedure. Pullman contends that any procedural violations, if present, do not entitle the plaintiffs to substantive relief. The Ninth Circuit in *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir.1984) acknowledged that, ordinarily, violations of ERISA's procedural requirements do not entitle a claimant to substantive relief. Nevertheless, the quantity of an employer's procedural violations may work a substantive harm. *Id.* at 1354. In this case, the unavailability of the policy for the great number of the employees and the complete lack of any formal claims procedure in addition to Pullman's interpretation of its policy prove that Pullman has acted

arbitrarily and in bad faith when interpreting and implementing its policy.

Plaintiffs have presented sufficient evidence that Pullman's interpretation of its benefits policy was arbitrary and capricious as a matter of law. The district court's grant of summary judgment in favor of plaintiffs is AFFIRMED.