Ronald **ADCOCK**, et al.,
Plaintiffs-Appellants,
Cross Appellees,

v.

The **FIRESTONE TIRE AND RUBBER COMPANY**, et al., Defendants-Appellees, Cross Appellants.

Nos. 85–6031, 85–6067.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 3, 1987.

Decided June 26, 1987.

John L. Van Cleave, argued, Robert E. Hoehn, Watkins, McGugin, McNeilly, Rowan, Nashville, Tenn., Lowe Watkins, for plaintiffs-appellants, cross-appellees.

William N. Ozier, argued, Bass, Berry and Sims, Nashville, Tenn., for defendants-appellees, cross-appellants.

Before LIVELY, Chief Judge; RYAN, Circuit Judge; and JOINER,[*] District Judge.

JOINER, Senior District Judge.

Plaintiffs are non-union salaried employees who worked in defendants' LaVergne, Tennessee tire plant ("the plant") at the time of the plant's sale to Bridgestone Tire and Rubber Company ("Bridgestone"). Plaintiffs brought this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, to recover, on account of the sale, reduction in force ("RIF") termination pay under defendants' termination pay plan. The district court granted defendants' motion for summary judgment based on the ground that defendants' determination that no RIF occurred upon the sale which would entitle plaintiffs to benefits was not arbitrary or capricious, 616 F.Supp. 409 (D.C.Tenn. 1985). Plaintiff appeals from this determination. The district court also held that defendants may become responsible for future benefits should Bridgestone terminate any plaintiff under circumstances that would constitute a RIF under the plan. Defendants cross-appeal from this decision.

### I.

Firestone's company-wide termination pay policy[1] was set forth in its Salaried Personnel Manual ("SPM") and Handbook for Salaried Employees ("the Handbook"). The SPM is a comprehensive and confidential document that was distributed only to personnel managers and senior executives, though relevant portions were made available to employees upon request. The Handbook was distributed to all salaried employees. The Handbook stated the employees were entitled to termination pay if they were released from the company because of a RIF. The SPM described a RIF as a termination when "necessary to eliminate a position because of reduced workload or due to economic necessity." According to the SPM, the goal of this termination pay was to minimize "the economic and mental stress of terminated employees ... between release from Firestone and securing other employment."

Defendants interpreted this plan to mean that if a plant was sold as an ongoing concern, no benefits would be paid. On the other hand, if a plant was not sold as such, and even if the purchaser eventually did decide to hire employees back, benefits would still be paid. Defendants explained that this "presumption of unemployment" was less expensive than the alternative of investigating each employee to see if they had been re-employed, and did not cause as much ill will with employees. Consistent with this policy, Firestone sold two plants (in Conover, North Carolina, and Arlington, Texas) not as ongoing concerns,[2] and in each case RIF benefits were paid. Similarly, in a sale of a plant in Romeo, Michigan, only one-half of the employees could be guaranteed jobs with the purchaser, and the other one-half received RIF benefits. The only aberration dealt with the sale of the Newport, Tennessee, Firestone plant as an ongoing concern, where a one-time Service Recognition Award was paid to all employees. According to defendants, this was done to compensate the employees for the fact that the purchaser provided few benefits, and had no pension plan.

---

[*] The Honorable Charles W. Joiner, Senior Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

[1] The plan is funded entirely by Firestone, and applies to non-union employees. Union employees subject to collective bargaining agreements have separate termination pay rights under those agreements.

[2] A sale as an ongoing concern is where there is a contractual agreement that all employees of the seller will be employed by the purchaser.

The terms of the LaVergne sale were spelled out in a seventy-five page agreement that dealt with the transfer of the plant and the continuing employment of the plant employees. The agreement explicitly stated that Firestone would not terminate any employees before the sale, and Bridgestone would employ every plant employee. In order to meet its commitment of maintaining the plant work force, Firestone adopted a policy of not permitting transfers of plant employees to other Firestone locations. In addition, due to its interpretation of its termination pay plan as described above, employees who accepted employment with Bridgestone did not receive severance pay due to a lack of unemployment, while those who chose not to accept such employment were treated as having resigned, and would therefore be ineligible for severance pay.[3] Pursuant to this agreement, the plant was sold as an ongoing concern on January 10, 1983, for $55,-000,000.[4]

Plaintiffs filed the present case on January 12, 1983, alleging that defendants' interpretation of the termination pay plan was arbitrary and capricious, and was therefore in violation of ERISA. After the filing of cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56(b), the district court granted defendants' motion on August 6, 1985. The district court began by noting that the SPM would not be heavily relied on, as its contents had not been communicated to the employees in accordance with the dictates of ERISA. In a similar vein, the district court noted that, by defendants' own admission, Firestone had not complied with the disclosure requirements of ERISA with regard to the termination pay plan in general, but that this noncompliance was not so severe or intentional as to constitute arbitrary and capricious conduct on defendant's part.

The district court then turned to the language of ERISA, and observed that ERISA did not provide for the vesting of employee welfare benefit plans,[5] and that this "silence" constituted a "gap" which had to be filled by federal common law. The district court determined that plaintiffs had a binding contractual right to termination pay, with the offer being the description of the plan in the Handbook, and the acceptance being plaintiffs continuing to work for Firestone. As such, the district court concluded that plaintiffs' entitlement to these benefits was vested, and that if Bridgestone terminated any plaintiff in the future under circumstances that constituted a RIF under the plan, defendants would be responsible for benefits.[6] However, the court also concluded that given defendants' past practices, it was not improper for them to deny benefit payments at the time of the plant sale, as plaintiffs were not yet unemployed, therefore no RIF had occurred.[7]

## II.

On appeal, plaintiffs contend that defendants' interpretation of the termination pay plan is arbitrary and capricious for two major reasons. First, plaintiffs argue that defendants' construction of the plan has not been uniform, and the distinction defendants make between ongoing and nonongoing concern sales is merely a "smoke screen" for inconsistency, as is demonstrated by the Newport sale. Second, plaintiffs contend that defendants have read in un-

3. The denial of severance benefits at the plant saved Firestone approximately $2,500,000.

4. The plant employees left work on Friday working for Firestone, and when they returned to work on the following Monday, they were working for Bridgestone. In the two years following the sale, only two former Firestone employees had been terminated, and both were terminated for cause.

5. The district court concluded that the termination pay plan constituted an employee wel-

fare benefit plan for the purposes of ERISA, and this conclusion is not disputed on appeal.

6. According to the district court, defendants would be responsible for benefits accrued up to the date of the plant sale to Bridgestone.

7. The district court distinguished the Newport sale, stating that while Bridgestone did not offer termination pay, the benefits it did offer were comparable to those offered by Firestone, and were much better than those offered by the purchaser in the Newport case.

employment as a prerequisite for benefits, yet no such requirement can be found in the wording of the plan. As a result, plaintiffs argue that defendants' approach is not consistent with a fair reading of the termination pay plan. Defendants respond that unemployment as a prerequisite is a reasonable interpretation, as the stated policy behind the plan is to decrease the trauma of unemployment. Defendants also argue that this interpretation is consistent with past readings of the plan, specifically pointing to the Conover and Arlington plant sales.

The district court granted summary judgment pursuant to Fed.R.Civ.P. 56(b) and will be affirmed only if it is determined that the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Matsushita Electric Industries Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In this context, all inferences from the facts must be viewed in a light most favorable to the non-moving party. *Id.* However, the movant need not present evidence to negate every aspect of the non-movant's claim, they need only support their own claim that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■ In reviewing the decisions of plan administrators under ERISA; the appropriate standard of review is whether the decision was arbitrary, capricious, or in bad faith. *Rhoton v. Central States Pension Fund*, 717 F.2d 988, 989 (6th Cir.1983); *Blakeman v. Mead Containers*, 779 F.2d 1146, 1149 (6th Cir.1985); *Cook v. Pension Plan For Salaried Employees*, 801 F.2d 865, 870 (6th Cir.1986). While plaintiffs argue for more of a *de novo* standard, this approach has been rejected in favor of the arbitrary or capricious standard, which ade-

quately protects the interests of employees with respect to employment benefits covered by ERISA. *See Crews v. Central States Pension Fund*, 788 F.2d 332, 336 (6th Cir.1986).

■ A reading of past cases dealing with similarly-worded termination pay plans reveals that courts have come out both ways on the issue of whether unemployment is a prerequisite for termination pay,[8] with an important factor often being how the employer had interpreted the plan at issue in the past. In the instant case, an examination of Firestone's past interpretation and application of the plan indicates that their present interpretation is consistent. An analysis of the Conover, Arlington, and Romeo plant sales demonstrates that regardless of whether a particular employee is employed by the plant purchaser or not, no termination benefits are paid when a plant is not sold as an ongoing concern. The only exception to this approach seems to be the Newport sale, but this court agrees with the district court that the Newport sale was a special case, and that the circumstances which lead to an exception being made are not present here. Consequently, based on consistency of interpretation, it cannot be said that defendants' interpretation of the plan in this instance was arbitrary or capricious.

Defendants' interpretation of the termination pay plan is also consistent with a fair reading of the plan, which as recognized by plaintiffs, is always an important consideration when judging the actions of an administrator of an ERISA plan. *Blau v. Del Monte Corp., supra*, 1354; *Blakeman v. Mead Containers, supra*, 1150. In analyzing plans such as the one at issue, courts have often held that unemployment should be a prerequisite for benefits, as severance pay is generally intended to tide an employee over while seeking a new job,

**8.** For cases holding that unemployment is a prerequisite to entitlement to termination pay, *see, Sly v. PR Mallory & Co., Inc.*, 712 F.2d 1209, 1213 (7th Cir.1983); *Jung v. FMC*, 755 F.2d 708, 713 (9th Cir.1985); *Holland v. Burlington Ind., Inc.*, 772 F.2d 1140, 1145 (4th Cir.1985), *aff'd*, —— U.S. ——, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986); *Blakeman v. Mead Containers, supra*,

1151. For cases reaching an opposite conclusion, *see Blau v. Del Monte Corp.*, 748 F.2d 1348, 1356 (9th Cir.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *Anderson v. CIBA–Geigy Corp.*, 759 F.2d 1518, 1521 (11th Cir.1985), *cert. denied*, 474 U.S. 995, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985); *Harris v. Pullman Standard, Inc.*, 809 F.2d 1495 (11th Cir.1987).

and should be considered more of an unemployment benefit. *Sly v. PR Mallory & Co. Inc., supra,* 1211; *Jung v. FMC, supra,* 713; *Holland v. Burlington Ind., Inc., supra,* 1149.[9] This is certainly appropriate in the instant case, as the SPM states that the goal of the plan is to reduce the stress of terminated employees between the time of their release and securing other employment.[10] This court believes that it is a fair reading of the plan to require unemployment as a prerequisite to finding that a RIF occurred which justifies the payment of termination pay.[11]

Accordingly, because there is no question that a RIF did not occur in this case, the district court was correct in holding that defendants' interpretation and application of the plan to plaintiffs was not arbitrary or capricious.

### III.

In their cross-appeal, defendants argue that the district court erred in holding that plaintiffs' entitlement to termination pay was vested under ERISA. Initially, defendants claim that the fact that ERISA specifically provides for the vesting of pension benefits, but not for employee welfare benefit plans,[12] is an intentional omission which indicates that Congress did not intend for such plans to be vested. It is not a gap, they argue, that requires federal common law interpretation. Defendants then go on to argue that the analysis of the

district court that the gap should be filled by a contract analysis has been recently rejected by this court in *In re White Farm Equipment Co.,* 788 F.2d 1186 (6th Cir. 1986). Plaintiffs take the same position the district court did, arguing that the contract approach is appropriate, and that the termination pay plan is the result of a bargained-for exchange.

This court will not address this issue, as it is not properly before us, nor was it properly before the district court. The jurisdiction of federal courts is limited by Article III of the United States Constitution to consideration of actual cases and controversies, therefore federal courts are not permitted to render advisory opinions. *Princeton University v. Schmid,* 455 U.S. 100, 102, 102 S.Ct. 867, 868, 70 L.Ed.2d 855 (1982); *Big Rivers Electric Corp. v. Environmental Protection Agency,* 523 F.2d 16, 19 (6th Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). The vesting question was not mentioned in the complaint, nor by any party in a motion for summary judgment, and was therefore never before the district court. As such, there was no actual vesting case or controversy for the district court to rule on, so the district court rendered an advisory opinion. This action was clearly improper, and must be vacated.[13]

### IV.

The decision of the district court granting defendants' motion for summary judg-

**9.** This is not to say that an employer may not, if it so desires, provide severance pay without the presence of unemployment, as Firestone does with employees at plants not sold as ongoing concerns. If such an approach is taken, the main concern will then be that the approach is consistently followed in similar cases, and as the above discussion indicates, that consistency is present here.

**10.** Plaintiffs argue that this court should not rely on the SPM for any analysis, because it was not properly disseminated to Firestone employees. While it is true that the SPM was not appropriately distributed to all employees, it would be elevating form over substance not to consider the clear intent of the termination pay plan as expressed in the SPM.

**11.** *Harris v. Pullman Standard, Inc.,* 809 F.2d 1495 (11th Cir.1987), submitted by plaintiffs after the instant case was argued, is distinguish-

able. First, unlike the instant plan language, the severance pay plan language in *Harris* more strongly suggested that unemployment was not a prerequisite to termination pay. 809 F.2d at 1498, 1499. Second, in *Harris* the plan administrator's interpretation of the severance pay plan was not consistent with its past practices, 809 F.2d at 1499, while here, defendants have consistently interpreted the plan.

**12.** *See* 29 U.S.C. § 1051(1); *McBarron v. S & T Industries,* 771 F.2d 94, 97 (6th Cir.1985).

**13.** If this court reviewed the district court's decision, it is likely that it would be reversed in light of *In re White Farm Equipment Co.,* 788 F.2d 1186, 1192–1192 (6th Cir.1986), which rejects the district court's contract analysis.

ment is AFFIRMED except for that part which holds that plaintiffs' entitlement to termination pay is vested. As to that part of the district court's decision, it is VACATED.

RYAN, Circuit Judge, concurs in the result and the court's judgment.