103 F.3d 131
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Tommy SILVEY, Plaintiff-Appellant,
v.
FMC CORPORATION LONG-TERM DISABILITY PLAN; and FMC
Corporation, Plan Administrator, Defendants-Appellees.
 No. 95-6251.
 United States Court of Appeals, Sixth Circuit.
 Nov. 27, 1996.
 
 Before: GUY and RYAN, Circuit Judges; and JARVIS, Chief District Judge.*
 RYAN, Circuit Judge.
 
 
 1
 The plaintiff, Tommy Silvey, filed this suit claiming that the defendants arbitrarily and capriciously terminated his long-term disability benefits, in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. We think the denial was not arbitrary and capricious, and we shall affirm.
 
 I.
 
 2
 Tommy Silvey worked for FMC Corporation until early 1987, when he stopped working because he suffered from conditions known as peripheral neuropathy and failed back syndrome. During his tenure at FMC, Silvey was covered by the FMC Corporation Long-Term Disability Plan, an entirely employee-funded plan established pursuant to the ERISA. After Silvey stopped working, he began receiving disability payments under the Plan as a totally disabled person, initially qualifying in February 1987.
 
 
 3
 The Plan contains two definitions of "totally disabled," one for the first two years of disability and a more stringent one for the period thereafter:
 
 
 4
 To be considered totally disabled, for the first two years, you must be wholly and continuously unable to perform every duty of your own job with FMC. After two years from the onset of the disability ..., you must be unable to work at any job for which you are, or may become reasonably fitted by education, training or experience.
 
 
 5
 The burden is on the claimant to demonstrate his entitlement to benefits under the Plan, and the Plan administrator is authorized to require proof of continued eligibility at any time.
 
 
 6
 After Silvey had been receiving benefits for five years, and after he had qualified for continuation of benefits under the more stringent standard, Kenneth J. Morrissey, an attorney employed by FMC, suspected that Silvey might be a malingerer and should be placed under surveillance. Silvey was then videotaped riding a lawnmower; trimming the yard with a weedeater; and assisting at a neighbor's yard sale. Armed with this information, Thomas L. Jacobs & Associates (TLJ), the claims administrator for the Plan, decided to examine Silvey's entitlement to benefits more closely. To that end, TLJ requested and received information from Silvey's doctors, including Silvey's treating physician, Dr. Mary Ellen Clinton, and had an independent medical examination conducted by one Dr. Dennis M. O'Keefe, and a vocational assessment performed by one Ronnie D. Wilkins.
 
 Dr. Clinton
 
 7
 opined that the medical evidence demonstrated that the plaintiff's condition has gotten worse since February of 1989 when he was initially found disabled. [She] also indicated that the plaintiff was capable of a combination of light and sedentary work for a period of no more than four (4) hours per day.
 
 
 8
 Dr. E. Richard Blonsky, TLJ's in-house physician and a Board-certified neurologist, disagreed with Dr. Clinton's evaluation, and concluded that while Silvey was "obviously deconditioned because of the inactive lifestyle he leads, in large part the probable result of over medication [sic], habituation and dependency on drugs," he was nonetheless "capable of a sedentary-light job." Dr. Blonsky also noted that the record contained "extensive statements as to how bad Silvey feels but no new objective medical evidence to validate ongoing disability." Wilkins, the vocational expert, issued a report based on a review of Silvey's medical records and the videotape, opining that it was improbable that Silvey was totally disabled, and noting that the activity performed by Silvey in the videotape would qualify as "medium" work. Wilkins concluded, however, that Silvey was best suited to light skilled or semi-skilled work, and listed several jobs that Silvey could perform. Finally, Dr. O'Keefe, who acted as an independent medical examiner, reported that Silvey could perform medium-level work at a full-time pace. He concluded that there had been no significant change in Silvey's neuropathy over the previous five years, and believed that Silvey's reports of pain were exaggerated.
 
 
 9
 In November 1992, Silvey was informed by George Hain of TLJ that his disability benefits would be terminated because he was no longer totally disabled. The letter from Hain indicated that the decision to terminate had been largely based on Dr. O'Keefe's opinions, but that Dr. O'Keefe's opinions had also been reviewed and affirmed by Dr. Blonsky.
 
 
 10
 Silvey appealed this decision to the Employee Welfare Benefits Plan Committee of FMC, and supplemented the record with additional material. The only individuals involved in the decision-making process with respect to Silvey's benefits were the Committee members, among whom were neither Morrissey nor Hain. According to one Committee member, "[t]here was no single most important factor" in evaluating Silvey's entitlement to continued benefits. The Committee "looked at all the evidence that was presented on both sides and reached a conclusion as to which side was most persuasive"; further, the Committee members had no disagreement as to the weight to be accorded various pieces of evidence.
 
 
 11
 In May 1993, the Committee voted unanimously to deny Silvey benefits, sending him a letter that, in relevant part, is as follows:
 
 
 12
 A major piece of evidence supporting Mr. Silvey's claim was the January 13 report letter of Dr. Mary Ellen Clinton, which disagreed with the evaluation of Dr. O'Keefe. As the opinions of Mr. Silvey's treating physician, Dr. Clinton's views would ordinarily be accorded additional weight, at least as to Mr. Silvey's capacities and prognosis. However, the Committee had some reservations about Dr. Clinton's objectivity because of her determination to "support" his "legal administrative battle to regain his benefits," before viewing the videotape or seeing the results of the functional capacities exam or latest EMG.
 
 
 13
 Dr. E. Richard Blonsky, [TLJ's] medical director, disputed Dr. Clinton's evaluation on several points. He opined that the MRI was fairly benign and that there was no evidence for radiculopathy. He also thought that the changes in the EMG were not great enough to justify her view that the neuropathy was progressing, given that the earlier study was done by a different person. Dr. Blonsky did agree with Dr. Clinton's view that Mr. Silvey is "capable of a sedentary-light job," but disagreed that he would be limited to four hours per day. Additionally, Dr. Blonsky thought Mr. Silvey would respond positively to a reduction in medication and a progressive increase in his activity level.
 
 
 14
 The letter then noted the opinion of Silvey's vocational expert that he was capable of performing only sedentary-to-light work for four hours a day, and not for a full forty-hour work week, but concluded that Silvey nonetheless had work capabilities beyond what was required to qualify as "totally disabled":
 
 
 15
 This [forty-hour week] standard is obviously one for determining full-time employment. However, the "any occupation" definition of total disability requires that the claimant show more than an inability to work full-time. Because [the vocational expert's] opinion does not even attempt to address the issue of the availability of adequate part-time employment for Mr. Silvey, it was completely unhelpful.
 
 
 16
 The Committee finally agreed with Mr. Wilkins's conclusion that Mr. Silvey can perform any one of the numerous jobs in the sedentary-to-light, unskilled or semi-skilled category, such as his past employment as an assistant grocery store manager. Such work could be done without lifting, which Mr. Silvey could not do safely, and would not require the high degree of motor coordination or dexterity that Mr. Silvey's neuropathy might prevent.
 
 
 17
 Following the denial of his appeal, Silvey filed suit in federal court, alleging that the termination of his long-term disability benefits was a breach of the Plan and a violation of the ERISA. The defendants moved for summary judgment following extensive discovery. A magistrate judge issued a lengthy report recommending that the motion be granted because "[c]learly, the Committee's decision is supported by substantial evidence." The district court adopted the magistrate judge's report and recommendation, and Silvey filed this timely appeal.
 
 II.
 
 18
 The Plan under consideration expressly grants the administrator discretionary authority to determine eligibility for benefits. We therefore review the administrator's decision to deny benefits using "the highly deferential arbitrary and capricious standard of review." Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir.1996); see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Occasionally appended to this standard have been the words "or in bad faith," such that some courts have described "the appropriate standard of review [as] whether the decision was arbitrary, capricious, or in bad faith." Adcock v. Firestone Tire & Rubber Co., 822 F.2d 623, 626 (6th Cir.1987). This standard "is the least demanding form of judicial review of administrative action.... When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Perry v. United Food & Commercial Workers Dist. Unions 405 & 442, 64 F.3d 238, 242 (6th Cir.1995) (internal quotation marks and citations omitted). We conduct de novo review, however, of the district court's grant of summary judgment in an ERISA claim. See Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 984 (6th Cir.1991). In other words, "this court must determine if there is any genuine issue of material fact whether the insurance company's decision to deny benefits was arbitrary or capricious." Id.
 
 
 19
 In VanderKlok v. Provident Life & Accident Insurance Co., 956 F.2d 610 (6th Cir.1992), this court explored at length the type of "totally disabled" definition used in the policy at issue here, rejecting the plaintiff's argument that so long as he was unable to perform his old job, he was totally disabled. In so doing, the court made clear that individuals capable of performing sedentary-to-light work are not totally disabled, id. at 614, although cautioning that courts must not go too far in construing "totally disabled":
 
 
 20
 We agree with the courts [that have held] that the phrase "prevented from engaging in every business or occupation" cannot be construed so narrowly that an individual must be utterly helpless to be considered disabled and that nominal employment, such as selling peanuts or pencils which would yield only a pittance, does not constitute a "business or occupation."
 
 
 21
 Id. at 614-15. Neither Vanderklok nor any other court has suggested, however, that it is incumbent on a plan administrator to conduct a detailed review of available jobs in order to demonstrate that a plaintiff is employable. See Miller, 925 F.2d at 985.
 
 
 22
 Silvey advances a number of arguments. First, he contends that because he was found entitled to long-term disability benefits in 1989, and because FMC cannot show, through objective medical evidence, that his condition has improved since 1989, he is therefore automatically entitled to disability benefits in 1992. The apparent underlying presumption is that FMC can never conclude that it wrongly awarded disability benefits in 1989. But it is simply of no consequence that FMC had earlier found Silvey to be entitled to long-term disability benefits under the stricter, "totally disabled" standard, since the Plan makes clear that it remains Silvey's obligation to prove, upon inquiry, that he remains totally disabled.
 
 
 23
 Next, Silvey suggests that Hain's initial rejection was based solely on Dr. O'Keefe's "outlandish" opinion, and that Hain later, in the course of preparing for his deposition in the district court proceedings, disavowed Dr. O'Keefe's opinion. The Committee was then incapable or automatically disallowed from reviewing Silvey's appeal of Hain's decision because Hain's decision was, at that point, without any foundation, "irrational and internally inconsistent," in Silvey's terms. Silvey also claims that the district court erroneously concluded that the Committee relied upon Dr. O'Keefe's opinion, and, therefore, further erred in concluding that the Committee's decision was supported by substantial evidence.
 
 
 24
 A review of the record, however, reveals the lack of factual support for these arguments, as neither Hain nor the Committee nor anyone else ever repudiated Dr. O'Keefe's opinion. In his deposition, Hain testified that it was irrelevant to him whether Dr. O'Keefe said Silvey could perform medium or light work, and that it would have satisfied him "if Dr. O'Keefe had said [Silvey] could do light and sedentary full time work." Furthermore, Hain would have concluded that Silvey was not disabled if Silvey could only have performed part-time work, so long as "he could work five days a week." And while Hain characterized Dr. O'Keefe's opinion regarding Silvey's health as "unusual," he did not do so in a critical way; instead, he cautioned that, in his view, "Mr. Silvey ... has recovered well, at least at that time he had recovered well." Likewise, while the Committee did not rely exclusively on Dr. O'Keefe's opinion, it did treat it as one item of evidence supporting its ultimate conclusion, which conclusion was further supported by other medical evidence, even though the other medical evidence differed in the details concerning Silvey's health.
 
 
 25
 Silvey makes an odd claim that "Hain set the standard of review for one with light-sedentary capabilities." Silvey appears to draw on Hain's deposition testimony as to what Hain might have done if he had thought Silvey's capacity was only for sedentary-to-light work, as opposed to medium work, and from there concludes that Hain's testimony sets an inappropriate standard for what must be done for any candidate capable of performing only sedentary-to-light work. Silvey accordingly argues that the Committee was required to determine whether he could perform significant, gainful employment.
 
 
 26
 Once again, Silvey misrepresents Hain's testimony. Hain did not testify that if he had known Silvey could perform only light-sedentary work at a part-time pace, he would have required certain additional corroboration that jobs existed for Silvey. Instead, when Silvey's attorney tried to get him to testify in that fashion, he answered simply that the question was "too vague" and too hypothetical to answer, but that he might be inclined to make further inquiries. Furthermore, Silvey incorrectly implies that all the information in the file was that he could work only part-time; in fact, Wilkins, Dr. Blonsky, and Dr. O'Keefe all believed that Silvey could work full-time. In any event, what Hain might or might not have done if he had initially decided that Silvey was only capable of light-to-sedentary work, as opposed to medium work, is of no moment. This court will only inquire into the rationality of the Committee 's decision, and as the magistrate judge below observed, there is no case law that suggests Hain's ideas of the appropriate inquiry is a legal standard that must be followed in order for a committee to avoid an arbitrary and capricious decision.
 
 
 27
 Silvey argues that Morrissey "hid crucial evidence" from the Committee, thereby acting in bad faith. Even if the Committee's decision had been supported by substantial evidence, he contends, this bad faith tainted the decision, and means that the decision is not based on the record as a whole. In reviewing this argument, we are governed by the well-settled rule that a party who does not articulate specific objections to a magistrate judge's report and recommendation forfeits his right to make the same argument on appeal to this court. See, e.g., Kelly v. Withrow, 25 F.3d 363, 365-66 (6th Cir.), cert. denied, 115 S.Ct. 674 (1994). Below, Silvey's bad-faith argument consisted solely of his complaints of Morrissey's alleged over-involvement, an argument that is without merit, as there is simply no case law to support an argument that Morrissey's interest in the case amounts to "bad faith," especially given that Morrissey was indisputably not a decisionmaker. And Silvey's appellate bad-faith argument is entirely different from the argument framed below. Silvey never mentioned Morrissey's alleged withholding of documentation to the magistrate judge, and did not refer to it in making his objections to the report and recommendation. Consequently, we will not consider it.
 
 
 28
 In sum, it is plain that the Committee considered the medical opinions of Dr. O'Keefe and Dr. Blonsky, taking into account the differing opinions of Dr. Clinton. The Committee also reviewed the opinions of all three vocational experts. It then concluded that Silvey was capable of performing sedentary-to-light work, and even gave an example of the type of job he could be expected to perform. This kind of analysis simply cannot give rise to a conclusion that the termination of benefits was arbitrary and capricious.
 
 III.
 
 29
 AFFIRMED.
 
 
 
 *The Honorable James H. Jarvis, II, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.