**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 519, Plaintiff**

v.

**UNITED PARCEL SERVICE, INC., Defendant**

**No. 3:00–CV–222.**

United States District Court, E.D. Tennessee, Northern Division.

Sept. 26, 2001.

Christopher J Oldham, Baker, Gulley & Oldham, PA, Knoxville, for Teamsters, Chauffeurs, Warehousemen and Helpers, Local 519, plaintiff.

Stephen W Grace, Waller Lansden Dortch & Davis, Nashville, for United Parcel Service, Inc., defendant.

### MEMORANDUM OPINION

JARVIS, District Judge.

Plaintiff, International Brotherhood of Teamsters, Local 519 ("Local 519"), filed this action seeking vacation of an arbitrator's award which upheld the termination of one of its members, Thomas P. Loftis ("Loftis"), by his employer, United Parcel Service, Inc. ("UPS"). In response, UPS filed both an answer and counterclaim seeking to enforce the arbitrator's award. Jurisdiction is predicated upon Section 301 of the Labor Management Relations Act of 1946, as amended, 29 U.S.C. § 185, and is not in dispute.

This lawsuit has its genesis in some sort of altercation which occurred between Loftis and a co-employee, Kenneth Ray Adkins ("Adkins"), at the UPS facility located at 500 Callahan Road in Knoxville, Tennessee, on April 29, 1999. Local 519 contends in this action that Loftis was improperly terminated for violating UPS' "zero-tolerance" policy against workplace violence, which policy is not part of the collective bargaining agreement between UPS and Local 519. Thus, Local 519 maintains that the arbitrator's decision upholding Loftis' discharge unlawfully violated the bargained-for terms of the agreement. UPS, on the other hand, contends that it properly terminated Loftis for just cause and, consequently, that the arbitrator's decision should be enforced.

This matter is presently before the court on the parties' motions for summary judgment [see Docs. 11 and 13]. The issues raised have been exceptionally well briefed by the parties [see Docs. 10, 14, 15, 18, 21, and 23]. Additionally, after the original underlying issues were briefed pursuant to the scheduling order [see Doc. 9], plaintiff moved to vacate the award of the arbitrator based upon the alleged fraud of UPS [see Doc. 26]. In conjunction with that motion, plaintiff also filed a motion to amend its complaint to allege that "the Award of the arbitrator was procured by the fraud or undue means of the defendant, UPS." [See Doc. 31]. The record reflects that those additional issues have now been fully briefed by the parties [see Docs. 26, 29, 32, 36, and 37]. For the reasons that follow, plaintiff's motions will be denied, UPS's motion will be granted, and the award of the arbitrator will be affirmed and enforced.

### I.

Local 519 is a voluntary association and a labor organization which provides representation to certain non-management and non-supervisory employees of UPS. In this case, Local 519 represents Loftis, whose discharge and subsequent grievance led to the arbitration which is the basis for this action. Local 519 and UPS have executed a collective bargaining agreement ("CBA" or "Agreement")[1] which governs the relationship between these parties and which addresses such things as wages, hours of work, benefits, and working conditions of the employees represented by Local 519. There are no other agreements between Local 519 and UPS.

The primary provision at issue in this case is Article 52 of the CBA, entitled **"DISCHARGE OR SUSPENSION,"** which sets forth, among other things, the conditions under which UPS may fire a bargaining unit employee:

---

1. The CBA in this case consists of two separate contracts: (1) the National Master United Parcel Service Agreement; and (2) the Southern Region Supplemental Agreement [see Doc. 1, Ex. A].

(A) The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give at least one (1) warning notice of a complaint against such employee to the employee, in writing, and a copy of the same to the Local Union, except that no warning notice need be given to an employee before discharge if the cause of such discharge is *dishonesty, drinking of or under the influence of alcoholic beverage or narcotics, including hallucinogens while on duty, carrying or permitting the carrying of drugs or narcotics on his/her person, or equipment, that is prohibited by State or Federal Law (including meal period), recklessness resulting in a serious accident while on duty, an unavoidable runaway accident, failure to report an accident, carrying of unauthorized passengers while on the job, engaging in unprovoked physical violence on Company property or while on duty.* The warning notice as herein provided shall be given to the employee with a copy to the Union within ten (10) working days of said complaint or within ten (10) working days of knowledge of said complaint and shall not remain in effect for a period of more than nine (9) months from date of said warning notice.

. . . . .

[*See* Doc. 1, Ex. A, pp. 174–75 (emphasis added)]. The above italicized language constitutes those offenses commonly referred to as "cardinal infractions" elsewhere in the CBA. For example, Article 7 limits UPS' power to fire summarily as follows:

> Except in cases involving cardinal infractions under the applicable Supplement, Rider or Addendum, an employee to be discharged or suspended shall be allowed to remain on the job, without loss of pay unless and until the discharge or suspension is sustained under the grievance procedure. Notwithstanding the foregoing, any superior provisions in Supplements, Riders or Addenda shall prevail. The Union agrees it will not unreasonably delay the processing of such cases.

[*See id.*, p. 16]. Also of significance in this case is Article 51, Section 3, of the CBA which sets forth the scope of the arbitrator's authority:

. . . . .

> The arbitrator shall have the authority to apply the terms of this Agreement, and to render a decision on any grievance coming before the arbitrator, but shall not have the authority to amend or modify this Agreement.... The decision of the arbitrator shall be final and binding on the parties and employees involved. In the event that the losing party fails to abide by the arbitrator's decision, or that either party refuses to submit to the arbitrator's jurisdiction, the other party shall have the right to take all legal or economic recourse.

[*See* Doc. 1, Ex. A, p. 174]. Consistent with that provision, the CBA also provides in Article 8, Section 6, as follows:

> The arbitrator shall have the authority to apply the provisions of this Agreement and to render a decision on any grievance coming before him/her but shall not have the authority to amend or modify this Agreement or to establish new terms or conditions of employment.

. . . . .

[*See id.*, p. 21]. Finally, UPS' workplace rules reflect a "zero-tolerance" policy against workplace violence and sexual harassment. To that end, UPS has placed posters around its Callahan Road facility which state, in pertinent part, as follows:

NO CLOWNING AROUND! UPS HAS A ZERO–TOLERANCE FOR WORKPLACE VIOLENCE AND SEXUAL HARASSMENT

*The following is applicable to all United Parcel Service employees—*

ZERO–TOLERANCE

At UPS we strive to maintain a comfortable work environment for all employees. When it comes to Sexual Harassment or Workplace Violence there is no room for clowning around. Workplace Violence (not limited to) includes pushing people around, even in horseplay, as well as verbal threats. As for sexual harassment—this includes (not limited to) unwelcome sexual advances, requests for sexual favors, and verbal or physical contact of a sexual nature. Actions such as these are not tolerated.

Both Workplace Violence and Sexual Harassment **will** result in disciplinary action up to and *including dismissal* and may subject the offender to personal legal and financial liability.

This is not intended as a full description or explanation of Workplace Violence or Sexual Harassment. This is only an informal briefing. For more information speak with a Human Resources Representative.

[Doc. 10, Ex. J (emphasis in original)].

## II.

Loftis was hired by UPS on June 2, 1987; he was terminated by UPS on May 4, 1999, as the result of events occurring on April 29, 1999. Local 519 grieved Loftis' termination on May 7, 1999, and when internal grievance procedures failed to resolve the dispute to Loftis' satisfaction, Local 519 and UPS agreed to submit the case to binding arbitration before Arbitrator Douglas Coleman. After a day-long hearing on December 7, 1999, Arbitrator

Coleman upheld Loftis' discharge, finding that even though Loftis did not commit one of the cardinal infractions listed in Article 52, UPS did have "just cause" to discharge him without prior warning for violating its zero-tolerance policy against workplace violence. Specifically, the award filed by Arbitrator Coleman on January 31, 2000, provides as follows:

*AWARD:*

Based on the evidence of record as a whole[,] the grievant violated the zero-tolerance policy by making verbal threats against K. Adkins, [sic] therefore under that policy "just cause" was established and since the decision was not made in an arbitrary, capricious or biased manner[,] the Arbitrator should not substitute his judgement for that of the Company's. The decision to discharge the grievant for "just cause" was proper. The grievance is denied.

[*See* Doc. 1, Ex. C, p. 15]. In making that award, Arbitrator Coleman summarized the testimony of the witnesses and made specific findings of fact regarding Loftis' behavior on the day of the altercation, which will now be outlined.

Arbitrator Coleman found that on the day in question, Adkins was having a discussion with another UPS employee, Frederick McCanelley, regarding a seniority issue. At some point during that conversation, Loftis walked into the room and became involved in that conversation, which escalated into, at a minimum, some sort of argument. Adkins reported to UPS that Loftis had both verbally and physically assaulted him and threatened to physically harm his family. UPS, through its security supervisor, David Cole, investigated the incident and interviewed Adkins and Loftis, as well as McCanelley. Adkins provided a detailed statement, both verbal and written, regarding what had occurred, while Loftis and McCanelley refused to

give a written statement and provided only a limited oral statement. It must be emphasized, however, that in their oral statements, both Loftis and McCanelley denied that any threats or physical touching had occurred between Loftis and Adkins.

Even though McCanelley refused to corroborate Adkins' report, Cole concluded that Adkins was being truthful about what had occurred and that Loftis and McCanelley were not. Cole based his conclusion not only upon the fact that Adkins was cooperative and provided detailed statements to him, but also upon the fact that Adkins was visibly shaken after the incident while, on the other hand, Loftis and McCanelley were joking shortly after the reported incident. Cole also considered the fact that Adkins was placing himself in a difficult position by complaining about a union brother along with a complete lack of reason or motivation for Adkins to fabricate a complaint about Loftis. Finally, Cole considered the fact that Loftis "has a record on file of threatening other employees, one of whom was a supervisor, so it was not inconceivable that ... Loftis threatened ... Adkins." [See Doc. 1, Ex. C, p. 5]. All of these factors led Cole to conclude that Loftis threatened physical violence and physically assaulted Adkins precisely in the manner reported by Adkins. Therefore, based upon its investigation, and consistent with its workplace policy prohibiting physical and verbal violence, as well as the language of the Agreement, UPS discharged Loftis from his employment effective May 4, 1999.

After summarizing the testimony of the witnesses and making his specific findings, Arbitrator Coleman then set forth the following conclusion:

The Arbitrator must make his decision on the provisions of the Agreement and the "zero-tolerance["] policy established for a safe and secure work environment. The rules of evidence and the regulations used by the Court, the Police, and the Department of Employment Security to make their decisions in this matter are not germane to the Arbitration decision.

The "zero tolerance" policy that the union has no quarrel with and the grievant is familiar with is not to be taken lightly, if his acts and words violated the policy than [sic] "just cause" exists even though such acts and words are of a short duration they are extremely serious and length of time is not the determing [sic] factor. The policy specifically states, verbal threats is [sic] part of the workplace violence criteria and is not to be tolerated. A violation of the workplace violence criteria **will** result in disciplinary action up to and including discharge.

The testimony of the grievant was less than truthful and evasive in many respects and his tendency to quickly lose his temper and to invite those he is angry with to meet him at the "Amoco" reinforces the perception that he did threaten K. Adkins and his family and did stand over him yelling obscenities.

K. Adkins was so upset at the time, [sic] that he called the police to tell them about the threats. Furthermore his charge against a fellow union member is a serious one, and could strain his future relations with other union members. However, his omission of any physical violence or contact in his original statement leaves one to question whether physical violence took place. In addition his harassment of F. McCanelly was unnecessary and should not have taken place.

The testimony of the Supervisor of Security carries great weight as it is his responsibility to investigate matters of this nature in an impartial manner and his recommendations and decisions

should not be lightly set aside, unless it can be shown his decision was made in an arbitrary, biased and capricious manner and did not follow the provisions of the Agreement or the zero-tolerance policy.

[*See* Doc. 1, Ex. 'C, p. 14–15 (emphasis in original) ].

One further fact must now be emphasized. In an affidavit filed on May 4, 2001 [*see* Doc. 27], Adkins recants his previous testimony during the arbitration proceeding and again at a chancery court injunction proceeding. Contrary to his earlier testimony, Adkins now agrees with Loftis that no physical contact occurred between them; rather, it was only a "heated" verbal exchange [*see id.*, ¶ 4]. Adkins testifies further that UPS knew that his testimony was "untrue" at both of these proceedings and that his previous untruthful testimony was "prepared under the threats and direction of David Cole."[2] [*See* Doc. 27, ¶¶ 18–19]. Thus, any finding by Arbitrator Coleman that Loftis physically assaulted Adkins is now in serious dispute. Nevertheless, as will be discussed in further detail, this inconsistency in Adkins' testimony has no impact on resolving the legal issues in this case because, as stated above, Arbitrator Coleman did not base his award, in whole or in part, on any physical assault by Loftis against Adkins. Rather, his decision was rendered solely on a finding of verbal threats by Loftis against Adkins and his family so that the legal issues will be considered only in that context.

## III.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)). The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although the moving party bears the initial burden, it need not support its motion with affidavits or other materials *"negating"* the opponent's claim. *Id.* at 323, 106 S.Ct. 2548 (emphasis in original); *Adcock v. Firestone Tire & Rubber Co.*, 822 F.2d 623, 626 (6th Cir.1987). Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party carries its initial burden of showing that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to come forward with specific facts to show that there is a genuine issue for trial. *Matsu-*

**2.** In a memorandum opinion and order filed on August 23, 2001, in another action arising out of these same events, *Thomas P. Loftis v. United Parcel Service, Inc., et al.*, No. 3:01–cv–267, this court has previously referred the matter regarding Adkins' affidavit to the attention of Assistant United States Attorney David G. Dake to determine whether Adkins has committed perjury in violation of 18

U.S.C. § 621 and whether Cole has committed subornation of perjury in violation of 18 U.S.C. § 622. The court makes note of its action in this opinion so that the court of appeals for this circuit (or any other reader) will not be left with the impression that this court has ignored possible perjury or subornation of perjury.

shita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* However, the non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The non-moving party must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505.

Upon review of all of the evidence relevant to the motion for summary judgment, a court should, after viewing the evidence in the light most favorable to the non-moving party, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505; *Boyd v. Ford Motor Co.*, 948 F.2d 283, 285 (6th Cir.1991), *cert. denied*, 503 U.S. 939, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992). Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505; *Stein v. National City Bank*, 942 F.2d 1062, 1064 (6th Cir.1991).

## IV.

### A.

The standard of review of an arbitrator's award is very narrow; thus, the courts must accord the arbitrator's decision substantial deference. *United Paperworkers Int'l. Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 36–37, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). In the Sixth Circuit, a court's review over an arbitration award is "one of the narrowest standards of judicial review in all of American jurisprudence." *Lattimer–Stevens Co. v. United Steelworkers of Am., AFL–CIO, Dist. 27, Sub–Dist. 5*, 913 F.2d 1166, 1169 (6th Cir.1990). The reason for this deference is the explicit statutory policy giving preference to the private settlement of labor disputes. *See* 29 U.S.C. § 173(d) ("Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement."). This policy "would be undermined if the courts had the final say on the merits of the awards." *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Thus, when a collective bargaining agreement provides for a private mechanism of arbitrating a dispute,

> it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them.

*Misco*, 484 U.S. at 37–38, 108 S.Ct. 364.

Therefore, if an arbitrator's award "draws its essence" from the collec-

tive bargaining agreement and is not merely the arbitrator's "own brand of industrial justice," this court must uphold the award. *See United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. at 597, 80 S.Ct. 1358. In *Cement Divisions, National Gypsum Co. v. United Steelworkers of America, AFL–CIO–CLC, Local 135*, 793 F.2d 759 (6th Cir.1986), the Sixth Circuit set forth four ways in which an arbitrator's award might fail to draw its essence from the agreement:

(1) when an award conflicts with the express terms of the collective bargaining agreement;

(2) when an award imposes additional requirements that are not expressly provided in the agreement;

(3) when an award is without rational support or cannot be rationally derived from the terms of the agreement; and

(4) when an award is based on general considerations of fairness and equity instead of the precise terms of the agreement.

*Id.* at 766 (citations omitted). If "the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38, 108 S.Ct. 364.

### B.

■ Applying these well-established legal principles to the facts of this case, the court concludes that Arbitrator Coleman's award should be enforced. Throughout its briefs, Local 519 argues that Arbitrator Coleman erred in interpreting the relevant provisions of the CBA by concluding that Loftis could be terminated for "just cause" even though he did not commit one of the cardinal infractions contained in Article 52 of the CBA. In other words, Local 519 argues that because Loftis engaged in "verbal" rather than "unprovoked physical" violence, the CBA prohibits UPS from discharging Loftis, or for that matter, any bargaining unit employee, unless that employee has received a warning notice and until the termination has been sustained through the grievance procedure. In effect, Local 519 argues that UPS is not permitted to terminate any employee, without a prior warning letter, unless he or she commits one of the seven cardinal infractions specifically listed in Article 52.

■ As a matter of contract interpretation, there is much to be said for Local 519's view of the CBA. When read together, Article 52 and Article 7 can arguably be construed as prohibiting UPS from discharging an employee for a reason that is not one of the seven cardinal infractions unless the employee has received a warning notice and until the termination has been sustained through the grievance procedure. However, this narrow approach to contract interpretation by Local 519 would not take into account other cognizable sources of federal labor law, such as the law of the shop, the industrial common law, and the like, nor does it appropriately recognize the role and decision of a skilled labor arbitrator. As observed by the Supreme Court:

The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement

permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

*See United Steelworkers of Am. v. Warrior Gulf N. Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

Therefore, the court concludes that while Local 519's narrow interpretation of the CBA is a reasonable one, so too is Arbitrator Coleman's more expansive view of the CBA. Article 52 of the CBA does not clearly and unambiguously provide that an employee may only be discharged or suspended if he or she commits one of the seven cardinal infractions or if he or she received a prior written warning for the same type of misconduct within the previous nine months. The clause at issue, for example, could have specified "only if" the employee commits one of the seven cardinal infractions may the employer summarily terminate an employee. For whatever reason, the language of Article 52 was couched in a more ambiguous manner. Thus, while Arbitrator Coleman did not explicitly interpret the list of cardinal infractions as non-inclusive, he did so implicitly when he determined that Loftis' verbal threats against Adkins not only violated the zero-tolerance policy of UPS, but also established "just cause" for UPS' termination of Loftis under the CBA. The court concludes that Arbitrator Coleman was "arguably construing or applying the [terms of the CBA] and [was] acting within the scope of his authority . . . ." *See Misco*,

484 U.S. at 38, 108 S.Ct. 364. Under these circumstances, even if Arbitrator Coleman "committed serious error [the court could not] overturn his decision." *See id.* Here, the court concludes that Arbitrator Coleman committed no error whatsoever.

Additionally, in considering the position of the parties, the court observes that Arbitrator Coleman's decision comports with the decision of at least ten other arbitrators in similar cases regarding UPS employees within the last decade [*see* Doc. 14, attachment]. Hence, Arbitrator Coleman is not simply imposing "his own brand of industrial justice," *see Gen. Truck Drivers, Local No. 957 v. Dayton Newspapers, Inc.*, 190 F.3d 434 (6th Cir.1999), so that his decision must be upheld.

This court's conclusion is also guided by the recent case of *Hawaii Teamsters, Local 996 v. United Parcel Service*, 241 F.3d 1177 (9th Cir.2001), which reaches the same conclusion based on the identical national master agreement between UPS and the International Brotherhood of Teamsters, the international union with which Local 519 is affiliated, as well as a similar supplemental agreement between the local branch and UPS. This court is of the opinion, just like the Ninth Circuit, that the arbitrator "was not acting on whim, but was seeking to give effect to the CBA [and that his decision] is further supported by reference to other arbitration awards interpreting the list of cardinal infractions as non-exclusive." *Id.* at 1183. Thus, given the extremely limited scope of judicial review in this case, this court too finds that Arbitrator Coleman did carefully consider the CBA and the common law of the shop—including specifically the zero-tolerance policy—of which both Loftis and his union were cognizant in reaching a decision which "draws its essence" from the CBA.

Finally, in reaching this decision, the court has considered the argument of Local 519 that UPS committed fraud, through Security Supervisor Cole, by encouraging Adkins to testify falsely that Loftis committed a physical assault—as opposed to a verbal assault—upon him. Given the fact that Arbitrator Coleman based his award solely on the fact that Loftis made only verbal threats against Adkins, it would serve no useful purpose to remand this case to Arbitrator Coleman to consider the fact that Adkins has now recanted his previous sworn testimony. In his written conclusion, Arbitrator Coleman specifically noted that "[Adkins'] omission of any physical violence or contact in his original statement leaves one to question whether physical violence took place." [See Doc. 1, Ex. C, p. 15]. Thus, Arbitrator Coleman did not base his award in favor of UPS on any finding of physical violence by Loftis against Adkins. It naturally follows, therefore, that any alleged fraud in Adkins' original testimony on this particular issue had no impact whatsoever on the award ultimately entered by Arbitrator Coleman. Any amendment to plaintiff's complaint making this allegation would therefore be futile. Hence, plaintiff's motions to that effect will be denied.

### V.

For the reasons foregoing, all of plaintiff's motions will be denied, and UPS' motion for summary judgment will be granted, whereby the award of Arbitrator Coleman will be affirmed and enforced.

Order accordingly.

### *ORDER*

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED as follows:

(1) Plaintiff's motion for summary judgment [Doc. 11] is DENIED;

(2) Defendant's cross-motion for summary judgment [Doc. 13] is GRANTED, whereby the award of Arbitrator Douglas Coleman filed on January 31, 2000, is hereby AFFIRMED and ENFORCED;

(3) Plaintiff's motion to vacate the award of the arbitrator based upon the fraud of the defendant, United Parcel Service, Inc., [Doc. 26] is DENIED; and

(4) Plaintiff's motion to amend the complaint [Doc. 31] is DENIED.