John F. CALLAHAN, et al., Plaintiffs–Appellants,

v.

ROUGE STEEL COMPANY, a Delaware corporation, Defendant–Appellee.

No. 90-1654.

United States Court of Appeals, Sixth Circuit.

Argued April 1, 1991.

Decided Aug. 13, 1991.

Rehearing and Rehearing En Banc Denied Oct. 16, 1991.

John R. Runyan, Theodore Sachs (argued and briefed), Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, Detroit, Mich., for plaintiffs-appellants.

Victor G. Marrocco, John M. Thomas (argued and briefed), Richard G. Gwizdz, Ford Motor Co., Dearborn, Mich., for defendant-appellee.

Before MARTIN, GUY and NELSON, Circuit Judges.

BOYCE F. MARTIN, JR., Circuit Judge.

This appeal, proceeding under section 502(a)(1)(B) of ERISA, involves claims made by present and former Great Lakes shipping officers who served aboard ships that provided ore, coal and other supplies to the Rouge Steel Company, a subsidiary of Ford Motor Company in River Rouge, Michigan. The issue before us is whether Rouge Steel's severance plan includes a condition abolishing severance benefits otherwise available to officers of a vessel which is sold by the company. Rouge Steel argues that the plan includes a condition precluding benefits when the officers are employed by a successor corporation, as happened here. The district court accepted this argument and entered summary judgment in favor of Rouge Steel. The shipping officers, on the other hand, assert the district court erroneously allowed this condition to be incorporated by reference into the plan; they argue ERISA requires such a limiting condition to be on the face of the plan itself. The officers allege that the dispute is inappropriate for summary judgment. We agree and remand to the district court.

During the course of the officers' employment for Rouge Steel Company, the company periodically distributed to them its "Marine Officer Policy for All Regular Officers on Vessels Operated by Rouge Steel Company." Rouge Steel last distributed the Policy in September of 1988. Included in the Policy is a provision titled "Separation Allowance," which set forth the procedure for determining when to give and how to calculate separation benefits. The provision states, in relevant part:

**B. Separation Allowance**

When a vessel is permanently removed from service, a regular marine officer whose employment is terminated either directly or indirectly as a result thereof shall be entitled to Separation Allowance in accordance with the following procedure:

A vessel may be removed from service *by sale,* by disposing of it and not replacing it, or by laying it up for an indefinite period of time. In any case, the permanent removal of a vessel is at the sole discretion of the Company.

. . . .

*The procedure for payment, calculation of payments and applicable administrative guidelines shall be the same as established for other salaried employees except as noted herein.*

(emphasis added). The calculation of severance benefits under the Marine Officer Policy is based in part upon the officer's length of service; accordingly, the benefits cushion the financial impact of unemployment and reward past service.

For reasons not explained, Ford and Rouge Steel decided it was time to exit the Great Lakes shipping business and sell or dispose of the large Lakes ships that it

owned. It appears that they owned four. In March, 1989, around six months after distributing the latest version of the Marine Officer Policy to the shipping officers, Rouge Steel entered into a contract to sell all of its vessels to Lakes Shipping Company, Inc. The terms of the contract included the sale of assets and a promise by Lakes Shipping to provide the shipping services previously performed by the Rouge Steel fleet for a period of ten years; this was not a stock transaction. Their agreement also included the following provision relating to the policy at issue in this case:

> [Lakes Shipping] and [Rouge Steel] intend that [Lakes Shipping] not be obligated to succeed, nor be deemed to be a successor to any collective bargaining agreement or any other express or implied employment related agreement, letter of understanding, plan policy, practice ... which relate to the employees of [Rouge Steel].

Lakes Shipping also agreed to offer employment to each of the officers necessary to operate two of the vessels.

At a meeting on March 13, 1989, Rouge Steel advised the officers that they would receive severance pay if Lakes Shipping did not offer a job but that they would not receive the benefits if Lakes Shipping did offer a job. Nowhere in the language of the Marine Officers Policy is there a provision precluding the granting of benefits when the marine officer is employed by the successor corporation. Rouge Steel based this decision upon the final paragraph of the policy titled Separation Allowance, set forth above, and a provision of the Ford Motor Company Separation Allowance Plan for Salaried Employees (Ford is the 100% owner of Rouge Steel), which states "[y]ou will not receive a Separation Allowance if you ... are released to be employed by a Successor Employer (any firm buying a Ford operation or facility as a going business)."

Rouge Steel contended that the "Successor Employer" provision in the Ford Motor Company Plan was an "applicable administrative guideline," incorporated by reference into the Rouge Steel severance plan.

None of the officers had seen or been provided a copy of the Ford plan or a summary of it prior to the March 13 meeting. On the first page of the summary plan description for the Ford plan was a footnote stating, "Part-time employees and Marine Officer Personnel are not included"; Rouge Steel did not give any weight to this footnote.

The officers asserted in the district court, as they do here, that the defendant's "Marine Officer Policy for all Regular Officers on Vessels Operated by Rouge Steel Company" requires that Rouge Steel pay a separation allowance. The district court determined that in order for the separation allowance to be paid two requirements must be met: first, a vessel must be removed from service and second, a marine officer's employment must be terminated by Rouge Steel. The court determined, "it seems clear from the facts in this case that those two criteria were met." However, the court denied benefits, concluding that Rouge Steel, through the last paragraph of the provision on separation allowances, incorporated the provision of the Ford plan abolishing benefits when its employees are given a job by a successor in interest.

Rouge Steel maintains on appeal that the Ford "Successor Employer" provision applies to the officers because the Marine Officer Policy directs that the procedures used for determining the severance benefits of marine officers "shall be the same as established for other salaried employees...." To strengthen this original argument Rouge Steel adds that the Marine Officer Policy incorporated the severance provisions of a Ford Industrial Relations Administration Manual, which specified that certain employees would not receive benefits when they received employment from a successor employer. Rouge Steel made no reference to this five volume manual during the March 13 meeting.

■ The Supreme Court in *Firestone Tire and Rubber, Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), set forth the standard for reviewing denials of benefits under ERISA plans. Relying upon "established principles of trust law,"

the Court concluded "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956. When such discretion is granted, the Court directed review under an arbitrary and capricious standard. *Id.*

The benefit plan at issue gives discretionary authority to Rouge Steel, the fiduciary in this case. The introductory paragraph to the entire Marine Officer Policy states:

This Statement of present policy, which is not to be considered an agreement, is subject to change or revision by the Company. *Final decisions shall be made by the Company as to the interpretation and application of this policy.*

(emphasis added). This language, set forth at the beginning of the policy, unequivocally grants to Rouge Steel, the fiduciary, "discretionary authority ... [to] construe the terms of the plan." *See Davis v. Kentucky Finance Cos. Retirement Plan,* 887 F.2d 689, 694 (6th Cir.1989) (we held that a provision stating "The Retirement Committee shall interpret the Plan and shall determine all questions arising in the administration, interpretation, and application of the Plan" gives the plan administrator "great discretion to interpret."), *cert. denied,* —— U.S. ——, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990). Thus, we review Rouge Steel's denial of benefits to the marine officers under the arbitrary and capricious standard.

The Supreme Court in *Bruch* added an angle to the arbitrary and capricious analysis which is important to consider in this case: "Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' Restatement (Second) of Trusts § 187, Comment d (1959)." 489 U.S. at 115, 109 S.Ct. at 956. Rouge Steel is both the fiduciary and the terminating employer in this case, presenting the proto-

typical situation in which a conflict of interest must be weighed.

Congress enacted ERISA in 1974 after "almost a decade of studying the Nation's private pension plans and other employee benefit plans." *Central States Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 569, 105 S.Ct. 2833, 2839, 86 L.Ed.2d 447 (1985) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980)). "Congress found that there had been a 'rapid and substantial' growth in the 'size, scope and numbers' of employee benefit plans and that 'the continued well-being and security of millions of employees and their dependents are directly affected by these plans.'" *Id.* (quoting 29 U.S.C. § 1001(a)). Accordingly, Congress declared it to be the policy of ERISA "to protect ... the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions and ready access to the Federal courts." 29 U.S.C. § 1001(b).

In furtherance of these objectives, ERISA requires all such plans be governed by a written instrument. 29 U.S.C. § 1102. In addition, Section 404(a)(1)(D) of ERISA specifically provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... in accordance with the documents and instruments governing the plan...." 29 U.S.C. § 1104(a)(1)(D). Fidelity to the written terms of an employee benefit plan was thought essential to give effect to one of ERISA's central purposes—to protect the participants and beneficiaries of employee benefit plans by insuring that employees are fully and accurately apprised of their rights under the plan. *See* H.R.Rep. No. 533, 93d Cong. (1973), *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4648–49, 4657.

To determine whether Rouge Steel acted in an arbitrary and capricious manner, the most important factor to weigh is the language of the plan itself as known by the employees, or as the employees should have known. *See Rhoton v. Central States Pension Fund,* 717 F.2d 988, 990 (6th Cir.1983). The language of the Rouge Steel Marine Officer Policy gives marine officers a right to the separation allowance whenever Rouge Steel removes a vessel from service and terminates the officer's employment:

When a vessel is permanently removed from service, a regular marine officer whose employment is terminated either directly or indirectly as a result thereof shall be entitled to Separation Allowance in accordance with the following procedure:

The plan includes "sale" as one way a vessel may be removed from service.

In the context of describing how the amount of separation allowance will be determined, the plan provides that "[t]he procedure for payment, calculation of payments and applicable administrative guidelines shall be the same as established for other salaried employees except as noted herein." It is this language, and this language alone, upon which the district court relied for its conclusion that the plan incorporated by reference the Ford Motor Company plan, which in turn contains the disqualification from separation allowance for employees released to a successor corporation.

We believe there are at least two problems with the district court's analysis. First, there is the difficulty in going from "other salaried employees" of Rouge Steel, as set forth in the Marine Officer Policy, to rules governing the employees of Ford Motor Company, another employer altogether. This basic difficulty is magnified by the fact that prior to the March 13 meeting none of the officers had seen or been provided a copy of the Ford plan or a summary of it. *See Rhoton,* 717 F.2d at 992.

Second, even if the Rouge Steel plan allowed for the incorporation of the Ford Motor Company plan, the Ford plan de-scription explicitly stated in a footnote on page one that "Marine Officer Personnel are not included." Assuming arguendo that the Rouge Steel employees are generally covered by the plan, this footnote provides an unambiguous exception for Rouge Steel marine officers. Given these problems, we believe the district court erred in ruling that as a matter of law Rouge Steel did not act arbitrarily and capriciously by incorporating through reference the severance provisions in the Ford plan.

As an alternative, Rouge Steel asserts this court should accept the incorporation of severance provisions in the Ford Industrial Relations Administration Manual. This again raises the problem of applying rules governing Ford employees to Rouge Steel marine officers. Incorporation of the provisions from the five volume manual might also create an exception to the granting of benefits which is not apparent from a literal reading of the plan provisions, thus violating ERISA. *See Rhoton,* 717 F.2d at 988; *Swackard v. Commission House Drivers Local 400,* 647 F.2d 712 (6th Cir.), *cert. denied,* 454 U.S. 1033, 102 S.Ct. 572, 70 L.Ed.2d 477 (1981). The "other salaried employees" provision relied upon for incorporating the manuals ends with the phrase: "except as noted herein." These four words, which were separately added to the plan in 1979, were presumably included to avoid the incorporation of conflicting or contradictory rules.

The transaction between Rouge Steel and Lakes Shipping was not just the sale of a single ship but involved the transfer of all the substantial assets of Rouge Steel and included an accompanying agreement of continuing service. The variations between different types of assets sales, however, are not accounted for in the Marine Officer Policy, which simply states removal of service may occur "by sale." Although the transaction was complicated, it was a sale of assets which, as the district court noted, meets the requirement for removal from service under the policy.

We also disagree with the dissent's assertion that the language, "a vessel may be removed from service by sale," as stated in

the Marine Officers Policy, does not mean "a vessel must automatically be deemed to have been removed from service whenever a sale occurs." The policy provision stating the possible ways a vessel may be removed states in full:

A vessel may be removed from service by sale, by disposing of it and not replacing it, or by laying it up for an indefinite period of time. In any case, the permanent removal of a vessel is at the sole discretion of the Company.

The plain language of this provision necessitates the district court's conclusion that the vessels were removed from service in this case. The provision sets forth a series of ways in which Rouge Steel could remove a vessel from service; the word "may" in this context is used by the parties to introduce an array of choices Rouge Steel has for removing a vessel from service. We do not believe that the use of the word 'may' in this context can reasonably be read to mean that Rouge Steel has discretion in determining whether a sale results in removal from service. Given the second sentence in the provision, to read the word in that manner would eliminate the need for the first sentence.

Once Rouge Steel chooses to sell a vessel, dispose of it and not replace it, or lay it up for an indefinite period of time, it has, according to the plain language of the Marine Officer Policy, removed the vessel from service. We do not need to look any further to see what happened to the vessel once one of these choices is made. Rouge Steel has complete discretion in removing a vessel from service; however, it cannot make one of the choices listed as a manner in which a vessel may be removed from service and then, at the same time, say the vessel had not been so removed.

The case is remanded to the district court for consideration.

RALPH B. GUY, Jr., Circuit Judge, concurring in part and dissenting in part.

I concur in that portion of Judge Martin's opinion that directs that this matter be remanded to the district court. In my opinion, the record was not adequately developed below, and this matter was not appropriate for disposition by summary judgment in favor of either party. Judge Nelson would decide this case in favor of the defendant, and Judge Martin appears to be stopping just short of deciding it for the plaintiffs. I am not comfortable in joining either view at this time.

DAVID A. NELSON, Circuit Judge, dissenting.

I would affirm the judgment, but for reasons that differ from the district court's.

The issue before us, as I see it, is not whether the Marine Officer Policy precludes the payment of separation allowances. The issue, rather, is whether, on the facts of this case, the language of the Policy must be said to mandate the payment of such allowances.

Nothing in the Marine Officers Policy can be read as mandating the payment of separation allowances except where a marine officer's employment has been terminated as a result of his vessel's having been "permanently removed from service" within the meaning of those words as used in the first sentence of Article VII B of the Policy. The threshold question, then, is whether the plaintiffs' vessels—the sale of which did not put the plaintiffs out of work—can fairly be said to have remained in service notwithstanding the sale. Marine officers who found themselves out of work for some reason other than removal of their vessel from service might qualify for separation allowances under policies applicable to Ford Motor and Rouge Steel employees generally, we are given to understand, but marine officers who continued working on the same vessel could not receive such benefits under the Marine Officer Policy or any other plan, as far as we know, unless the vessel was "permanently removed from service."

Rouge Steel sold its three-vessel marine fleet to Lakes Shipping Company under a purchase agreement dated March 23, 1989. Notwithstanding the sale, a transportation agreement of even date recited that Rouge still wished to have iron ore, limestone and

coal transported to its facilities at Dearborn, Michigan. Lakes Shipping Company and its parent corporation, the other parties to the transportation agreement, recited their willingness "to transport the raw material requirements of [Rouge] via water transportation on the Great Lakes to the same extent as currently so transported by [Rouge]," and Lakes Shipping was employed to transport 100 percent of Rouge's iron ore, limestone and coal requirements during each navigation season in a term commencing in 1989 and continuing to December 31, 1999. Under § 6(d) of the purchase agreement, Lakes Shipping agreed to "offer employment to such of the active licensed officers employed by [Rouge] and assigned to the Vessels who are necessary to operate [two of the boats being sold,] the S.S. Benson Ford and the S.S. William Clay Ford." [1]

One of the three vessels, the M.S. Henry Ford II, was apparently taken out of service at or before the point of sale because it was unseaworthy. Any officer who lost his job because of the Henry Ford's removal from service was entitled to separation pay under the Marine Officer Policy. The other two vessels continued in service, staffed by the same people and carrying the same cargo to the same destination for the same company. The question, to repeat, is whether the fact that these vessels now had a new owner meant that they had been "removed from service" within the meaning of those words as used in the Marine Officer Policy.

1. Lakes Shipping also agreed that if any of the Rouge Steel marine officers hired under § 6(d) should be laid off during the year following the sale, each such officer would receive a separation allowance. Under the plaintiffs' interpretation, therefore, it would be possible for officers to receive double separation allowances; one by reason of the sale of the vessels, and the other by reason of a subsequent lay off.

2. The affidavit of Marlene Bankwitz, the Marine Representative at Ford Motor Companys' Rouge Steel subsidiary, states that in resolving pay and benefit questions for marine officers it was often necessary for Rouge Steel to refer to Ford's Industrial Relations Administration Manual and other Ford documents. This was so, Ms. Bankwitz's affidavit explains, because the Marine

In rejecting Rouge Steel's argument that the vessels had not been removed from service, the district court reasoned thus:

"At least three officers who were terminated when the sale to Lakes Shipping occurred were given separation allowances, even though their vessels continued to sail under Lakes Shipping. Thus, Rouge Steel has clearly acknowledged that the sale of the vessels constituted removal of those vessels from service."

If these officers received separation allowances under the Marine Officer Policy, I would agree that payment of the allowances could be taken as evidence that Rouge Steel considered the Benson Ford and William Clay Ford to have been removed from service. But there has been no showing, to my knowledge, that Rouge viewed the separation allowances as payments made under the Marine Officer Policy.

The record makes it abundantly clear that the Marine Officer Policy was not designed to cover the waterfront, so to speak; the Policy spelled out some of the benefits available to marine officers, but not all of them.[2] If a marine officer returned from military service at a time when no suitable position was available, for example, he would receive separation pay—not because of the retirement of a vessel from service, but because it was the practice to accord separation pay to all salaried employees of Ford and Rouge Steel under these circumstances. Similarly, as I understand it, marine officers could receive separation pay if they were simply laid off and

Officer Policy "was only a summary of the *unique* terms and conditions of employment, pay and benefits for the marine officers." (Emphasis supplied.) The record shows without contradiction that Ford's administration manual applied to all Rouge Steel employees. See ¶ 2 of the affidavit of Howard Johnson, of Ford's Employee Relations Staff. And the uncontradicted affidavit of Richard Wood, also of Ford's Employee Relations Staff, states that "[e]xcept for unique situations that arose as a result of the special aspects of marine officer employment, the practice at Ford and Rouge Steel was to treat the marine officers the same as other salaried employees of Ford and Rouge Steel in similar situations."

not offered another position paying at least 80 percent as much, or if they retired at age 65 without having qualified for noncontributory retirement pay under the general retirement plan. These separation benefits were available to salaried employees on a company-wide basis, and were not contingent, in the case of marine officers, on a vessel's having been permanently removed from service. The mere fact that separation allowances were paid to three officers who were put out of work when the fleet was sold, therefore, does not indicate that Rouge was acknowledging a removal from service of any vessel other than the Henry Ford II. And the plaintiffs in this case, as I understand it, are not claiming a right to severance benefits under any company-wide plan or policy; if they have a right to severance benefits, it is under Article VII B of the Marine Officer Policy.

Several of the plaintiffs admitted in deposition testimony that they themselves did not believe that their vessels had been taken out of service when title to the vessels passed from Ford to Rouge Steel several years earlier. It is true that Rouge was a Ford subsidiary, while Lakes Shipping was a subsidiary of a different company. Given that Lakes Shipping was going to operate two of the vessels with the same people who had served on them before the transfer of title, however, and given that the vessels were to be operated in the same trade, carrying the same type of cargo for the same consignee, I do not think it would be arbitrary or capricious to conclude that the vessels had not been taken out of service. Such a conclusion gives a common-sense, non-technical meaning to the language of the Policy. This interpretation is by no means inevitable, but it strikes me as perfectly reasonable—and if it is reasonable, it is permissible.

The fact that the Marine Officer Policy says that "[a] vessel may be removed from service by sale" does not, to my mind, suggest that a vessel must automatically be deemed to have been removed from service whenever a sale occurs. A vessel is removed from service if it is sold for scrap, or sold for conversion into a floating restaurant, or sold for operation in a different trade with different crews, but it does not follow that a vessel is removed from service by sale when the sale is made on terms that contemplate no removal from service.[3]

If it had been intended that a separation allowance be payable upon the removal of a vessel from service *as a company-owned boat,* it would have been simple enough to say so. In a different context, indeed, the Marine Officer Policy uses the phrase "Company service." If some such phraseology had been used in the first line of Article VII B, the plaintiffs would have had a far stronger case than the one actually presented.

I agree, finally, that the potential conflict between the interests of Rouge Steel and the interests of the plaintiffs is a factor that must be weighed in determining whether Rouge Steel abused the broad discretion it had in making decisions as to the interpretation and application of the Marine Officer Policy. But such a conflict "is only one factor to be considered...." *Varhola v. Cyclops Corp.,* 914 F.2d 259 (6th Cir. 1990). This factor cannot change the plain language of the Marine Officer Policy— and that language simply does not provide for payment of a separation allowance unless a vessel is "permanently removed from service." Under the particular facts presented here, I do not believe that Rouge

---

**3.** Although Article VII B says that a vessel "may" be removed from service by sale, I do not, of course, read this as meaning that Rouge Steel has discretion to characterize a sale that results in removal from service as a sale that does not result in removal from service. Whether to make a sale at all, and whether to make a sale on terms that in fact keep the vessel in service, are matters that lie in the sole discretion of the company; but once a sale has been made, the company cannot act arbitrarily and capriciously in characterizing the terms of the sale for purposes of applying the Marine Officers Policy.

If the terms of a particular sale leave room to say that there is no removal from service, what gives the company discretion to say so is not the word "may" in Article VII B, but the second sentence of the Policy's first paragraph: "Final decisions shall be made by the Company as to the interpretation and application of this [P]olicy."

Steel was required to find that the two vessels which continued to carry the company's iron ore, limestone and coal, using the same personnel, were vessels that had been "removed from service."

There is no dispute as to the material facts in this case, and the case was thus ripe for disposition on the parties' cross-motions for summary judgment. If it is arbitrary and capricious to say that the S.S. Benson Ford and the S.S. William Clay Ford were not "removed from service," we should, in my view, direct the district court to grant the plaintiffs' motion for summary judgment against Rouge Steel. If it is not arbitrary and capricious to say so, I think we should affirm the summary judgment in favor of Rouge Steel. The argument in favor of the former course has been very ably presented by the plaintiffs' counsel, but the argument in favor of the latter course strikes me as stronger.