Scott D. DALESANDRO, et al., Plaintiffs,

v.

INTERNATIONAL PAPER COMPANY, Defendant.

No. 01–CV–109.

United States District Court, S.D. Ohio, Western Division.

March 21, 2003.

Myron Auer Wolf, Henderson, Deis & Wolf, Hamilton, OH, Theresa Lee Groh, John Charles Murdock, Murdock, Goldenberg, Schneider & Groh, Cincinnati, OH, for plaintiffs.

W. Carter Younger, McGuire Woods LLP, Richmond, VA, Michael A. Roberts, Graydon, Head & Ritchey, Cincinnati, OH, Amy Miller, McGuire Woods LLP, Washington, DC, for defendant.

## AMENDED ORDER *

BECKWITH, District Judge.

This matter is before the Court on Defendant International Paper Company's Motion

---

* Pursuant to Rule 60(a) of the Federal Rules of Civil Procedure, the Court issues this Amended

for Judgment on the Administrative Record (Doc. No. 23) and Motion for Leave to Supplement Motion for Judgment on the Administrative Record (Doc. No. 36). Also before the Court are Plaintiffs' Motion to Compel Discovery (Doc. No. 27), Motion to Compel Production Pursuant to Subpoena (Doc. No. 28), Motion for Class Certification (Doc. No. 29), and Motion for Judgment (Doc. No. 29). For the reasons that follow, Defendant's motion for judgment on the administrative record is not well-taken and is **DENIED**; Defendant's motion for leave to supplement is **MOOT**. Plaintiffs' motion for judgment is well-taken and is **GRANTED**; Plaintiffs' motion for class certification is well-taken and is **GRANTED**.

## I. *Background*

This case is another in a series of lawsuits arising out of the sale by International Paper Company of the B Street Mill, located in Hamilton, Ohio, to Smart Paper LLC in February 2001. The named plaintiffs in this case are Scott Dalesandro and Diane Noonan. Dalesandro and Noonan were formerly salaried employees of the B Street Mill who subsequently gained employment with Smart Paper after the sale of the Mill. Plaintiffs bring suit against International Paper on behalf of themselves and a potential class of salaried employees for recovery of severance benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

The plan in question in this case is the Champion International Paper Corporation Reorganization Policy # 828 ("the Plan"), which was adopted in May 2000.[1] There is no dispute that the Plan is a welfare benefit plan governed by ERISA. Complaint ¶ 10; Answer ¶ 10. As described by the summary plan description ("SPD"), the relevant portions of the Plan state the following:

2. *Purpose of the Policy.* The purpose of the policy is to provide certain severance and other benefits to employees of the Company whose employment is Terminated as a result of Reorganization. The policy is an employee benefit plan under Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

. . .

The Policy sets forth certain benefits extended to Eligible Employees whose employment is Terminated during the Policy Period as a result of Reorganization.

. . .

1.2 *Cause* is deliberate unacceptable performance of duties, deliberate unsatisfactory performance (Employee refuses to improve unsatisfactory performance), excessive absenteeism, violation of rules, gross negligence, dishonesty, acts in bad faith, fraud and/or insubordination.

1.6 *Eligible Employee* is an Employee who is Terminated and who has executed an effective Release.

. . .

1.8 *Merger* is the merger between International Paper Company or a subsidiary thereof and Champion International Corporation.

. . .

1.10 *Policy Period* is the period from the closing of the Merger to and including its one year anniversary.

. . .

1.12 *Reorganization* consists of employment action(s) resulting in an Eligible Employee's Termination during the Policy Period.

. . .

1.14 *Terminated or Termination* is either:

(a) a termination by the Company of the employment of an Employee for any reason other than Cause, disability (subject to Section 6 hereof), or death, which Termination occurs during the Policy Period. Subject to (b) below, it shall not be deemed a termination of employment if after the Merger the Employee is transferred to the employment of International Paper Company or a subsidiary thereof; or

Order to correct the inadvertent omission of the word "not" following the word "does" in the last sentence of footnote 3 of the Order of March 18, 2003 (Doc. No. 39).

1. Champion International Corporation and International Paper Company merged in June 2000.

(b) a termination during the Policy Period by an Employee of his or her employment under the following circumstances: (i) during the Policy Period there is either a reduction of the Employee's Earnings or a relocation of an Employee's principal place of employment other than to the Borough of Manhattan in the City of New York, New York (if the Employee's principal place of employment immediately prior to the Policy Period is Stamford, Connecticut) or to any other location that is not more than thirty-five (35) miles by automobile from the location of the Employee's principal place of employment immediately prior to the Policy Period; provided that a relocation of an Employee's principal place of employment from a foreign assignment to the Employee's home location will not be deemed a Termination; and

(ii) the Employee elects to terminate his or her employment upon not less than thirty (30) calendar days' advance notice to the Company given within not more than thirty (30) calendar days after the earlier of either receipt by the Employee of such reduction or relocation, or the date on which the first payment of the reduced Earnings is received by the Employee or the date on which the relocation of the Employee's principal place of employment becomes effective.

Doc. No. 29, Ex. 1. The Plan then provides that upon Termination, Eligible Employees would receive severance benefits of 10 weeks' earnings, plus one week of earnings for each year of service, plus an additional one week of earnings for each year of service over fifteen years, with the total payment not to exceed 78 weeks' earnings. *See id.*, § 2. In addition, Eligible Employees who were at least age 49 at the time of termination and whose combination of age and years of service equaled 59 were eligible for enhanced pension benefits. *Id.* § 3.

In January 2001, Plaintiffs received the following letter, dated January 8, 2001, signed by both the general manager and operations manager of the Mill:

Dear Employee of the Hamilton B Street Mill:

As you are aware, it has been Champion International's intention to sell the Hamilton, Ohio Paper Mill operations (Hamilton Mill) since October 1997. On June 16, 2000, International Paper reached a merger agreement with Champion International and has continued with the intention to sell the Hamilton Mill.

This letter is to inform you that IP/Champion International has signed an agreement to sell substantially all the assets of the Hamilton Mill to Smart Paper LLC, which intends to operate the Hamilton Mill if feasible.

Your employment with International Paper will terminate when the sales transaction is finalized, and you are encouraged to seek employment with Smart Papers. We have enclosed a letter from Smart Papers explaining their employment application process.

Doc. No. 29, Ex. 15.

As indicated, the sale of the B Street Mill to Smart Paper was consummated in February 2001. On February 9, 2001, the human resources department distributed an email to the salaried employees of the Mill containing a list of frequently asked questions ("FAQ") about the severance plan. The FAQ indicated the following about the plan: 1) a salaried employee who was offered a position with Smart Paper at the same salary, but declined the offer of employment, was not eligible for severance benefits; 2) a salaried employee who was offered a position at Smart Paper at a lower base salary, and who declined the offer of employment, would not forfeit severance benefits; 3) an employee who accepted an offer of employment with Smart Paper at a lower base salary would not be entitled to severance benefits; and 4) an employee who was not offered a position with Smart Paper because of a failed drug test would remain eligible for severance benefits. Doc. No. 29, Ex. 8.

Plaintiffs' employment with International Paper ended on February 9, 2001. Complaint ¶ 26. Plaintiffs were required to go through an exit process with International Paper which essentially consisted of removing personal belongings and accounting for or turning in property owned by Internation-

al Paper. *See id.* ¶ 32; Doc. No. 29, Ex. 17. Plaintiffs then went through an interview process and were hired by Smart Paper. Complaint ¶¶ 35, 37. International Paper did not provide severance benefits to Plaintiffs under the Plan. *Id.* ¶ 41.

On February 22, 2001, Plaintiffs filed this lawsuit for recovery of severance benefits pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B), on behalf of themselves and a potential class of former salaried employees of International Paper who were hired by Smart Paper and did not receive severance benefits. On April 27, 2001, the Court entered an order (Doc. No. 13) staying these proceedings because Plaintiffs had not exhausted the administrative remedies provided by the Plan before filing suit. On January 19, 2002, the Court lifted the stay upon notification by Plaintiffs that they had exhausted their administrative appeals and that their claims for benefits had been denied. *See* Doc. Nos. 14 & 19.

On March 12, 2001, Plan Administrator Robert Florio issued his decision on Plaintiffs' claims for severance benefits. Mr. Florio interpreted the plan as follows:

*Considerations*

The Administrator has evaluated the terms of Policy 828 and the underlying rationale for Policy 828. The Administrator has also consulted with counsel about the interpretation of Policy 828 as applied to the sale of the Mill.

The stated purpose of Policy 828 is to provide severance and other benefits to employees whose "employment is Terminated as a result of Reorganization." Policy 828, Section 2. Under Policy 828, "Reorganization" has a specific definition as follows.

"*Reorganization* consists of employment action(s) resulting in an Eligible Employee's Termination during the Policy Period". Policy 828, SPD Section 1.12.

For a "Reorganization" to occur that triggers the application of Policy 828, there are two elements. First, the employee must suffer an "employment action". Second, there must be a Termination.

The phrase, "employment action", is not defined in Policy 828. Therefore, the term must be interpreted in light of the pur-

poses of Policy 828 and ordinary usage. In ordinary usage, "employment action" carries the connotation of an action by an employer that has an adverse effect on an employee. If the employee is able to continue in the same position under the same working conditions, there is no adverse effect on the employee. This interpretation of the term is consistent with the purpose of Policy 828 to protect employees who are adversely affected by a change in their employment.

The second element is a "Termination" must occur. It is clear Policy 828 was not intended to cover every situation in which an employee ceases to work for the Company after the Merger. The definition of "Termination" requires a "termination by the Company of the employment of an Employee." Policy 828, SPD Section 1.14(a). The definition includes an example of how Policy 828 is to be interpreted. The SPD notes that a transfer to another subsidiary of International Paper Company is not a termination (unless it involves a relocation of the principal place of employment). Policy 828, SPD Section 1.14(a).

The Administrator notes that the descriptions of Reorganization and Termination are only in a summary plan description. A summary plan description may not contain all the terms of the plan. As with any summary plan description, there may be a need to interpret the plan on matters that are not specifically dealt with in the plan or summary plan description. The sale of the Mill with an offer of employment from the buyer is a matter that is not specifically dealt with in Policy 828 or the SPD. Therefore, it is an appropriate subject of interpretation by the Administrator.

*Determination*

Based on this analysis, the Administrator makes the following determination with respect to Policy 828 as it applies to the sale of the Mill:

1. The sale of the Mill is an event that may trigger the application of Policy 828 to employees at the Mill.

2. If an employee at the Mill does not receive an offer of continued employment

from the Buyer, the employee will be entitled to benefits under Policy 828.

3. If an employee of the Mill receives an offer of employment from the Buyer at the same or higher salary as previously paid by Champion and accepts the offer, there is not an "employment action" with respect to the employee. Therefore, the employee will not be eligible for benefits under Policy 828.

4. If an employee receives an offer of employment as described in paragraph 3 and the employee chooses not to accept the offer of employment from the Buyer, the termination of employment would be a voluntary termination by the employee for purposes of Policy 828. The employee is not entitled to severance after a voluntary termination (except in limited circumstances not applicable to this situation). Therefore, the employee will not be eligible for benefits under Policy 828.

5. If an employee at the Mill receives an offer of continued employment from the Buyer at a lower salary than previously paid by Champion or which requires relocation (based on a thirty-five mile standard), the employee will be eligible for benefits under Policy 828 if the employee does not accept the job with the Buyer.

Doc. No. 29, Ex. 10. On appeal, on December 7, 2001, International Paper's vice president of human resources affirmed Mr. Florio's determination that Plaintiffs are not entitled to severance benefits under the Plan because of their continued employment with Smart Paper. *Id.* Ex. 13.

Each side has moved for judgment on the administrative record (Doc. Nos. 23 & 29). In addition, Plaintiffs have moved the Court to compel International Paper to produce documents they feel are relevant to their claims (Doc. No. 27). Likewise, Plaintiffs move the Court to compel Smart Paper LLC to produce documents relevant to the case pursuant to a subpoena issued to Smart Paper on May 23, 2002 (Doc. No. 28). Finally, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs move the Court to certify a class of plaintiffs consisting of former employees who were terminated by International Paper and did not receive severance benefits under the Plan (Doc. No. 29).

## II. *Analysis*

### A. *Review of the Plan Administrator's Determination*

#### 1. *Standard of Review*

■ There is some dispute between the parties as to the proper standard to be applied to the review of the plan administrator's decision, as well as whether discovery should be expanded beyond the materials contained in the administrative record. In *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir.1998), the Court held that both the summary judgment procedures set forth in Rule 56 of the Federal Rules of Civil Procedure and the bench trial procedures set forth in Rule 52 are inapplicable in ERISA cases for review of the plan administrator's decision. *Id.* at 617–18. Instead, the Court held that when reviewing a decision of an ERISA plan administrator *de novo*, the court should render independent findings of fact and conclusions of law based solely on the materials contained in the administrative record. *Id.* at 619. The district court may consider materials outside the administrative record only in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process or bias on the part of the administrator. *Id.*

The Court notes that there appears to be some indecision whether the scope of the materials before the district court should be limited to the administrative record in cases reviewed under the more deferential arbitrary and capricious standard. *Compare Bucks v. Reliance Standard Life Ins. Co.*, No. 99–3398, 2000 WL 659029, at *3 n. 1 (6th Cir. May 12, 2000) ("In this case, however, the administrator is given such discretionary authority, and therefore the reasoning in *Wilkins* may not apply."), *with, Combs v. Retirement Plan for Hourly Employees of RAG American Coal Co.*, 42 Fed.Appx. 776, 778–79 (6th Cir.2002) (stating that the Court's review was limited to the administrative record; plan gave administrator discretionary authority to determine eligibility and interpret the plan). Logic seems to dictate that if the materials before the district court are limited to the administrative record under the *de novo* standard of review, the

record before the court should be so limited under the more deferential arbitrary and capricious standard. Because, as explained further below, the Court finds that judgment should be granted to Plaintiffs on the record currently before it, the Court need not attempt to reconcile the apparently divergent interpretations of *Wilkins*.

Finally, as suggested above, there is some dispute as to whether the Court should review Mr. Florio's decision under the *de novo* standard or the deferential arbitrary and capricious standard. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that the district court's review of an ERISA plan administrator's decision should be conducted under the arbitrary and capricious standard if the plan gives the administrator the authority to determine eligibility for benefits and construe the terms of the plan. *Id.* at 115, 109 S.Ct. 948. In this case, the Plan provides:

> The Administrator has the authority, responsibility and discretion to determine all questions of eligibility and status and has the right to interpret the provisions of the Policy. Any determination by the Administrator shall be final and conclusive.

Doc. No. 29, Ex. 1, § 10. In the Court's opinion, the section quoted unmistakably gives the plan administrator discretionary authority to determine eligibility for benefits and construe the Plan's provisions. Accordingly, the Court concludes that review of the plan administrator's decision should be conducted under the arbitrary and capricious standard of review.

### 2. *Analysis of the Decision*

The arbitrary and capricious standard is the least demanding standard of review of an administrative action. *Davis v. Kentucky Finance Cos. Retirement Plan,* 887 F.2d 689, 693 (6th Cir.1989). Under this standard, the decision of the plan administrator will be upheld if it is possible to offer a reasoned explanation, based on the evidence, for the decision. *Id.* In other words, the plan administrator's interpretation of the plan must be reasonable. *Shelby County Health Care Corp. v. Southern Council of Ind. Workers Health & Welfare Trust Fund,* 203 F.3d 926, 933 (6th Cir.2000). In interpreting the plan, the plan administrator must adhere to the plain meaning of the language as it would be construed by an ordinary person. *Id.* at 934; *See Callahan v. Rouge Steel Co.,* 941 F.2d 456, 460 (6th Cir.1991) ("To determine whether Rouge Steel acted in an arbitrary and capricious manner, the most important factor to weigh is the language of the plan itself as known by the employees, or as the employees should have known."). The district court should uphold the plan administrator's interpretation of the plan, even if it disagrees with his interpretation, if it is rationally related to a valid plan purpose and is not contrary to the plain language of the plan. *Cook v. Pension Plan for Salaried Employees,* 801 F.2d 865, 870 (6th Cir.1986). Stated another way, an interpretation of the plan that is contrary to the plain language of the plan will be arbitrary and capricious. In this case, the Court finds that in interpreting the Plan, Mr. Florio failed to adhere to the plain meaning of its language. Therefore, the plan administrator's interpretation of the Plan was arbitrary and capricious.

In reviewing the Plan, Mr. Florio recognized, as does this Court, that it does not specifically address a situation wherein an employee is terminated by the Company because of the sale of the Mill and is subsequently hired by the buyer. Thus, Mr. Florio apparently concluded that the Plan contained an ambiguity as to its applicability in this particular situation and set forth to give an interpretation of the term "Terminated" or "Termination." Mr. Florio reasoned that the purpose of the Plan was to provide benefits upon Reorganization, which is defined in the plan as an employment action which results in Termination. Mr. Florio further found that the Plan does not define "employment action" and that, since employment action typically connotes an adverse action, any employee who was subsequently hired by Smart Paper did not suffer an adverse action. As a result, Mr. Florio concluded, employees who were hired by Smart Paper were are not entitled to severance benefits under the Plan.

In reaching his decision as he did, however, what Mr. Florio really did was read out of the Plan the provision that made payment of

benefits contingent upon Termination, as that term is defined in the Plan, and instead made payment contingent upon his own interpretation of the meaning of "employment action." The plain language of Section 1.14 states that a "Termination" occurs when the Company terminates the employment of an employee *"for any reason other than Cause, disability ... or death."* Doc. No. 29, Ex. 1, § 1.14 (emphasis added). In this case, it is clear that International Paper terminated Plaintiffs' employment for reasons other than cause, disability, or death, namely, the sale of the Mill.[2] The Plan states that "Reorganization consists of employment action(s) resulting in an Eligible Employee's Termination during the Policy Period." Doc. No. 29, Ex. 1, § 1.12. According to this sentence's plain meaning, an "employment action" is something that results in "Termination." In other words, "employment action" for purposes of the severance plan means "Termination." Thus, contrary to Mr. Florio's conclusion, the term "employment action" does not need to be defined in order to determine whether an employee is eligible for severance benefits. The fact that Plaintiffs' employment was terminated, and "Terminated," under circumstances not specifically taken into consideration by the Plan does not otherwise make the plain language of the Termination provision ambiguous.

International Paper argues, however, the Plan was only intended to provide a safety net to employees in case they were unable to immediately secure other employment. In response, the Court observes that had International Paper desired to make employees who received subsequent employment with the purchaser of the Mill ineligible for severance benefits, it could have included a specific provision to that effect. *See Bellino v. Schlumberger Tech., Inc.,* 944 F.2d 26, 32 (1st Cir.1991) ("Had Schlumberger wished to

do so, it easily could have written into the Plan the severance policy it now seeks to employ."). The Court notes that a earlier severance plan adopted by Champion contained an provision which specifically made employees who were hired by the purchaser ineligible for severance benefits. *See* Doc. No. 29, Ex. 14, § 1.8(a) (*"Excluded Employee* is an employee who ... is offered employment by the Purchaser."). In any event, an intent not communicated in the Plan cannot be used to contradict otherwise unambiguous plan language. *See Schake v. Colt Ind. Operating Corp. Severance Plan for Salaried Employees,* 910 F.2d 90, 99 (3rd Cir.1990). As stated above, the terms "Termination" and "Terminated" are unambiguous. Thus, International Paper's "safety net" approach to plan interpretation cannot supersede the plain language of the provision.[3]

International Paper also argues that the Plan should not be interpreted so that Plaintiffs receive a windfall through participation in the severance plan and cites a number of cases in support of this contention. The Court's own research has not uncovered any cases which state that the plain language of the plan should be ignored simply because the effect of implementing the plain language will result in a windfall to the plan participants. The cases cited by International Paper are distinguishable.

In *Adcock v. Firestone Tire & Rubber Co.,* 822 F.2d 623 (6th Cir.1987), the Court found that the plan administrator's interpretation that unemployment was a precondition to receipt of severance pay was not arbitrary and capricious because Firestone had consistently interpreted the plan to require unemployment as a prerequisite. *Id.* at 626. In this case, however, there has been no evidence presented that International Paper has consistently interpreted *this plan* to require

---

**2.** Via the January 8, 2001 letter, International Paper informed Plaintiffs that "your employment with International Paper will terminate when the sales transaction is finalized[.]" Doc. No. 29, Ex. 15. Moreover, Plaintiffs went through an exit process which required them to return company property and had to go through an entire application and interview process to secure employment with Smart Paper. Thus, the record amply establishes that Plaintiffs were "Terminated," as that term is used in the Plan.

**3.** The Plan does in fact say that its purpose is to provide "certain severance and other benefits to employees of the Company whose employment is Terminated as a result of Reorganization." Doc. No. 29, Ex. 1. As the Court has explained, Plaintiffs were "Terminated" as a result of "Reorganization," as those terms are explicitly defined by the Plan. Thus, payment of severance benefits to Plaintiffs under the circumstances of this case does not contradict the stated purpose of the Plan.

continued unemployment as a precondition to payment of severance benefits. Moreover, the *Adcock* Court recognized that an employer may draft a severance plan which results in a windfall to terminated employees. *See id.* at 627 n. 9 ("This is not to say that an employer may not, if it so desires, provide severance pay without the presence of unemployment, as Firestone does with employees at plants not sold as ongoing concerns."). The Court also distinguished a case submitted by plaintiffs, *Harris v. Pullman Standard, Inc.,* 809 F.2d 1495 (11th Cir.1987), on the grounds that in *Harris* "the severance pay plan language ... more strongly suggested that unemployment was not a prerequisite to termination pay." *See id.* at 627 n. 11. As the Court stated above, in this case, under the unambiguous definition of "Termination" and "Terminated," Plaintiffs are entitled to severance pay despite their subsequent employment by Smart Paper.

In *Douglas v. Bendix Corp.,* No. 87–3201, 1988 WL 4469 (6th Cir. Jan. 26, 1988), the severance plan provided that employees who declined offers of employment with the purchaser would not be eligible for termination pay, but did not specifically say that employees who accepted employment with the purchaser would not be eligible for termination pay. *See id.* at **1, 2. The Court held that the plan administrator's decision that plaintiffs, who accepted employment with successor company, were not entitled to severance pay was not an arbitrary and capricious interpretation of the plan because the purpose of the plan was to alleviate the loss caused by unemployment, which was fulfilled when plaintiffs accepted new jobs. *Id.* at *2. *Douglas* is distinguishable from the present case. The plan administrator's decision in *Douglas* is really a sensible extrapolation of the language the plan did contain—if under the plan one is not entitled to severance if he or she rejects an employment offer with the purchaser, it is therefore reasonable to find that one is not entitled to severance if one accepts subsequent employment. In this case, the plan contains no such provision from which a similar interpretation could reasonably be extracted. To the contrary, the definition of "Termination" is quite explicit, and, we think, does not leave room to find that subsequent employment with the

purchaser makes an employee ineligible for severance benefits.

*Easterly v. Philips Electronics North Am. Corp.,* 37 Fed.Appx. 166 (6th Cir.2002), is distinguishable because in that case the Court found that the plan language regarding separation of employment was ambiguous. *See id.* at 169. In this case, as the Court has noted several times, the Plan's language regarding termination of employment is not ambiguous. The Court further notes that like the plan is *Douglas,* the plan in *Easterly* specifically provided that employees who refused comparable offers of employment were not eligible for severance benefits. *See id.* at 167. Again, the plan administrator's decision that employees who accept employment with the purchaser are not entitled to severance pay is a sensible extrapolation of an existing provision. In addition, the plan in *Easterly* stated that its purpose was to financially assist employees who are laid off or are separated for the convenience of the company. *Id.* at 167. According to the Court, plan purpose appeared to assume that a period of unemployment would be required before the onset of financial hardship, which would then trigger the need for severance benefits. *Id.* at 169. Employees who are immediately rehired at a comparable salary do not suffer any financial hardship. By contrast, in this case, the purpose of the plan is to pay severance benefits to employees whose employment is Terminated, and, as indicated *supra,* at 480 n. 3, paying severance benefits to Plaintiffs under the circumstances of this case does not contravene the stated purpose of the plan.

*Garavuso v. Shoe Corp. of Am. Ind., Inc.,* 709 F.Supp. 1423 (S.D.Ohio), *aff'd,* 892 F.2d 79 (6th Cir.1989), is distinguishable for most of the reasons discussed in reference to *Adcock, Douglas,* and *Easterly.*

In summary, in this case, the plan administrator's determination that Plaintiffs are not entitled to severance pay upon the termination of their employment with International Paper was arbitrary and capricious because he interpreted the plan to require employees to suffer an "employment action" in order to be eligible for severance benefits, and in doing so, ignored the plain meaning

of the terms "Terminated" and "Termination." Because Plaintiffs were Terminated within the plain meaning of the Plan, they are entitled to the severance benefits provided therein. Accordingly, International Paper's motion for judgment on the administrative record is not well-taken and is DENIED. Plaintiff's motion for judgment is well-taken and is GRANTED.

### B. *Motion for Class Certification*

■ Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs move the Court to certify a class of plaintiffs consisting of salaried employees who were terminated from International Paper and then hired by Smart Paper and who did not receive severance benefits. International Paper concedes that the proposed class meets the requirements of Rule 23(a), except for employees who failed to submit claims for severance pay in accordance with § 11.3.[4] *See* Doc. No. 23, at 42. It appears that are some 66 former salaried employees of the Mill who did not submit formal claims for severance benefits. International Paper does not state if or how Rule 23(b) applies to the proposed class, although Plaintiffs believe that certification under Rule 23(b)(3) would be appropriate. Since, however, there appears to no dispute about the appropriateness of certifying a class of salaried employees who did file claims for severance benefits, the Court turns to International Paper's contention that the class should not contain non-filers.

Only "participants" and "beneficiaries" have standing under ERISA to assert claims for plan benefits. 29 U.S.C. § 1132(a)(1) (B); *Teagardener v. Republic–Franklin, Inc. Pension Plan,* 909 F.2d 947, 951 (6th Cir.1990). In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court amplified the definition of participant:

> In our view, the term "participant" is naturally read to mean either "employees in, or reasonably expected to be in, currently covered employment," or former employees who have ... a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits. In order to establish that he or she

"may become eligible" for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future.

*Id.* at 117, 109 S.Ct. 948 (internal citations and quotation marks omitted). International Paper argues that the non-filers will never have a colorable claim for benefits, and therefore are not participants under ERISA, because they failed to file claims for severance pay within the one year time limit established by § 11.3 of the Plan.

Contrary to International Paper's contention, the Court views the issue of the non-filers' failure to file claims for severance benefits as one of exhaustion of administrative remedies rather than as one of standing. The cases cited by International Paper for the proposition that Plaintiffs are not participants because their claims are time-barred are distinguishable. *Adamson v. Armco, Inc.,* 44 F.3d 650 (8th Cir.1995) and *American Medical Security, Inc. v. Auto Club Ins. Ass'n of Mich.,* 238 F.3d 743 (6th Cir.2001) both involved situations where the plaintiffs failed to file claims for benefits within the limitations period *established by statute. See Adamson,* 44 F.3d at 653–54; *American Medical Security,* 238 F.3d at 752. Neither case held that the plaintiffs were not participants through application of the claims period established by the plan document. International Paper does not contend that claims of the non-filers are barred by a statutorily imposed limitations period.

In *Teagardener,* the plaintiffs claimed they were entitled to share in a final distribution of the residual plan assets after the plan was terminated. These plaintiffs, however, were not considered participants because the entitlement to share in the distribution of assets did not arise until the plan was amended, which occurred after the plaintiffs has already received annuities under the terms of the unamended plan. *Teagardener,* 909 F.2d at 948, 952. In other words, these plaintiffs were not participants because they had no vested right to share in the distribution of the residual assets of the terminated plan.

---

**4.** This section provides that all claims for severance benefits must be made within one year of the event giving rise to the claim. *See* Doc. No. 29, Ex. 1, at § 11.3.

*Id.* at 952. Thus, *Teagardener* is distinguishable because it did not involve application of a limitations period imposed by the plan.

*Sallee v. Rexnord Corp.,* 985 F.2d 927 (7th Cir.1993), is distinguishable because in that case the plaintiffs were not considered participants under the severance plan because they voluntarily quit before they were terminated, an eligibility requirement for payment of benefits. *See id.* at 928–29. Like the plaintiffs in *Teagardener,* these plaintiffs' claims for severance benefits never vested. *Id.* A limitations period was not an issue in *Sallee. Stanton v. Gulf Oil Corp.,* 792 F.2d 432 (4th Cir.1986), presented a situation similar to that in *Teagardener*—the plaintiff was not considered a participant because the plan was modified to provide expanded benefits after he had retired and accepted benefits under the old plan. *Id.* at 434. Therefore, *Stanton* is distinguishable for the same reasons as *Teagardener.*

In this case, the non-filers satisfy the basic eligibility requirements for receipt of severance pay—they were "Terminated" as the term is defined by the Plan. The fact of their failure to file a claim for benefits goes not to their eligibility to but to the failure to utilize the administrative procedures in the plan document. Therefore, as indicated, the status of the non-filers is not one of standing.

■ Ordinarily, ERISA claimants must exhaust the plan's administrative procedures prior to filing suit to recover plan benefits. *Weiner v. Klais & Co., Inc.,* 108 F.3d 86, 90 (6th Cir.1997). In its discretion, the district court may waive the exhaustion requirement where resorting to the administrative process would be futile or where the remedy would be inadequate. *Fallick v. Nationwide Mutual Ins. Co.,* 162 F.3d 410, 419 (6th Cir.1998). In this case, it would have been futile for the non-filers to file claims for severance benefits. As with the plaintiffs who did file claims, the question of their entitlement to severance benefits turned on the plan administrator's interpretation of "Terminated" and "Termination." The record shows that the plan administrator's decision interpreting the plan was one of general applicability to all persons affected by the sale of the Mill to Smart Paper. *See* Doc. No. 29, Ex. 10. It is clear that the plan administrator would not have reached a different decision had the

non-filers filed individual claims for severance benefits. Accordingly, the Court finds that the non-filers need not have exhausted the Plan's administrative remedies.

■ As regards Rule 23, the Court believes that the waiver of exhaustion of remedies requirement as to the non-filers brings the interests of filers and the non-filers into alignment such that the typicality, commonality, and adequacy of representation issues identified by International Paper are no longer present. The filers' and the non-filers' claims for severance pay all depend on the same definition of "Terminated" and "Termination" in the Plan. The only conflict between the filers and the non-filers was the somewhat artificial distinction of the Plan's administrative procedures. Now that this distinction has been eliminated the Court sees no issues regarding typicality, commonality, and adequacy of representation which would preclude the non-filers from participating in the proposed class.

The claims of the non-filers meet the typicality requirement because they arise from the same event and course of conduct (the sale of the Mill) and are based on the same legal theory (the plan administrator's arbitrary and capricious interpretation of the plan). *In re American Medical Sys., Inc.,* 75 F.3d 1069, 1082 (6th Cir.1996). The commonality requirement is satisfied, at a minimum, because the non-filers share a common question of law with the filers, namely, the proper interpretation of the Plan. *See id.* at 1080. International Paper does not challenge the adequacy of class counsel, only whether the filers can adequately represent the interests of the non-filers. The Court finds that they can. The adequacy of representation requirement is usually satisfied if the commonality and typicality requirements are met. *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ("The adequacy-of-representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a), which serve as guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests

of the class members will be fairly and adequately protected in their absence.") (internal quotation marks omitted). Given that the claims of the non-filers satisfy the typicality and commonality requirements, the Court finds that the adequacy of representation requirement is also satisfied.

 Finally, the class is properly certifiable under Rule 23(b)(3) because common questions of law (the proper interpretation of the plan) predominate over individual questions. In fact, the only individual questions would seem to be the individual calculations of benefits due, which goes to the issue of damages and which does not preclude Rule 23(b)(3) certification. *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). Finally, given that a uniform application of the Plan to all claimants is desirable, a class action is clearly a superior method to resolve this controversy.

Accordingly, Plaintiffs' motion for class certification is well-taken and is **GRANTED**. Pursuant to Plaintiffs' motion, the class in this case shall consist of all participants under Severance Policy # 828 who were employed by International Paper Company at the Hamilton B Street Mill and who were terminated without cause on February 9, 2001 as a result of the sale of the Mill to Smart Paper, and who were denied severance benefits under Severance Policy # 828.

### Conclusion

In conclusion, for the reasons stated, International Paper's motion for judgment on the administrative record (Doc. No. 23) is not well-taken and is **DENIED**. Plaintiffs' motion for judgment (Doc. No. 29) is well-taken and is **GRANTED**. International Paper's motion to supplement the administrative record (Doc. No. 36) is **MOOT**. Plaintiffs' motion for class certification (Doc. No. 29) is well-taken and is **GRANTED**. In light of these rulings, the Court believes that Plaintiffs' discovery-related motions (Doc. Nos. 27 & 28) are now **MOOT**. If this conclusion is erroneous, within ten (10) days of the date of this order, Plaintiffs may file a notice with the Court identifying what discovery is still needed as a result of these rulings. International Paper may file a response or opposition to Plaintiffs' supplemental discovery requests, if desired, in accordance with Southern District of Ohio Local Rule 7.2(a)(2). Likewise, Plaintiffs may file a reply brief in accordance with Rule 7.2(a)(2).

**IT IS SO ORDERED**